**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re:<br><br>THE ALIERA COMPANIES, INC.<br>d/b/a Aliera Healthcare, Inc., *et al.*,[1]<br><br>Debtors. | **Case No. 21-11548 (TMH)**<br>Currently pending in the U.S. Bankruptcy<br>Court for the District of Delaware |
| ALIERA LT, LLC, AS LIQUIDATING<br>TRUSTEE FOR THE ALIERA<br>COMPANIES, INC. D/B/A ALIERA<br>HEALTHCARE INC., ET AL. and NEIL F.<br>LURIA, IN HIS CAPACITY AS THE<br>TRUSTEE OF THE SHARITY<br>MINISTRIES, INC., LIQUIDATING<br>TRUST,<br><br>                    Plaintiffs,<br><br>v.<br><br>AMERICAN MEDICAL PLANS, LLC and<br>THOMAS S FERGUSON<br><br>                    Defendants. | **Adversary Proceeding No**. __-_____ |

## COMPLAINT

Plaintiffs, Aliera LT, LLC, as Liquidating Trustee (the "Aliera Trustee") for The Aliera

Companies, Inc., *et al*. (the "Debtors") and Neil F. Luria, in his capacity as the Trustee of the

Sharity Ministries, Inc. Liquidating Trust (the "Sharity Trustee", and collectively with the Aliera

Trustee, the "Plaintiffs"), set forth their complaint against Defendants American Medical Plans,

LLC ("American Medical") and Thomas S Ferguson ("Ferguson", together with American

Medical, the "Defendants"), and allege as follows:

---

[1] The jointly administered Debtors in these Chapter 11 cases along with the last four digits of their federal tax identification number include: The Aliera Companies Inc. (9555) (Case No. 21-11548), Advevo LLC (6736) (Case No. 22-10124), Ensurian Agency LLC (3244) (Case No. 22-10123), Tactic Edge Solutions LLC (2923) (Case No. 22-10122) and USA Benefits & Administrators LLC (5803) (Case No. 22-10121).

**INTRODUCTION**

1.      This is an action to rectify the Defendants' participation in a massive scheme perpetrated under the guise of healthcare sharing ministries ("HCSM"), which are an exception to the Affordable Care Act (the "ACA").  The Defendants played a critical role in the marketing and sale of health insurance-like products to individual consumers, which products turned out to be fraudulent in nature.  Through this litigation, the Plaintiffs seek the recovery of amounts paid by the Debtors to the Defendants, which were obtained by funds paid by certain of the members (the "Members") of Sharity Ministries, Inc. f/k/a Trinity Healthshare Inc. ("Sharity") and a predecessor Unity Healthshare ("Unity") and the value of goods and services provided by the Debtors' arm's length creditors, as well as damages against the Defendants for their involvement in this scheme.

2.      The Debtors were established by a convicted felon Timothy Moses ("Moses"), his spouse Shelley Steele ("Steele"), and their son Chase Moses ("Chase") at the expense of the Debtors' arm's length creditors and the Members.  Sharity was an entity effectively controlled by Moses, Steele, and Chase which purported to be a HCSM.  These insiders of the Debtors caused the Members' payments to be transferred to the Debtors and then transferred certain of those funds to the Defendants, rendering Sharity insolvent and unable to pay the Members' medical expenses and resulting in the Debtors' arm's length creditors not receiving payment on their claims.

3.      As part of this scheme, the Debtors paid the Defendants, and other insurance brokers, unreasonably high fees to encourage the Defendants' continued and increased sale of its plans.  Through the sales that were made to the Members, neither the Debtors nor the Defendants disclosed that Aliera was not setting aside reserves to pay the benefits promised to the Members but was instead using the Members' payments to pay administrative costs, including unreasonably high commission payments to the Defendants and funds to support the lavish lifestyles of Aliera's principals.

4.      As a result of this scheme, Sharity has been enjoined from conducting business by regulators in at least nine states; it became insolvent; and sought Chapter 11 protection.  Debtor The Aliera Companies, Inc. ("Aliera") has also been enjoined from conducting business in at least six states, and became insolvent prior to its Chapter 11 filing, and collapsed into bankruptcy in December 2021 after various state regulators and consumer plaintiffs filed litigation against it alleging consumer fraud claims relating to the illegal insurance business.

5.      From 2018 through 2021, the Defendants received in excess of $400,000 in fees and commissions from Aliera that were never disclosed to the Members, leaving both Sharity and Aliera insolvent and unable to pay the Members and arm's length creditors.  Aliera's insiders and its insurance agents, including the Defendants, perpetrated a fraud on the Members by (1) accepting fees and commissions well in excess of industry norms and often exceeding the true value of the HCSM plans; (2) misrepresenting the nature and accuracy of the HCSM plans; and (3) misrepresenting to the Members that they were covered by a valid policy that would be able to cover their claims and medical expenses.  The Plaintiffs bring this adversary proceeding for the return of these undisclosed fees and commissions paid to the Defendants and to seek recovery for damages caused by the Defendants' misconduct.

**PARTIES, JURISDICTION AND VENUE**

6.      This proceeding relates to the jointly administered Chapter 11 cases of *In re The Aliera Companies, Inc., et al.*, Case No. 21-11548-TMH (the "Bankruptcy Cases") pending in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court").   The Bankruptcy Cases were originally filed on December 21, 2021 in this Court, but were later transferred to the Delaware Court to align with an involuntary bankruptcy petition (the "Involuntary Petition") filed against Aliera on December 3, 2021 (the "Petition Date").  Subsequent to the transfer of venue of the Bankruptcy Cases to the Delaware Court, Aliera

withdrew its Motion to Dismiss and consented to entry of an order for relief under Chapter 11 in the Debtors' bankruptcy cases.   On February 16, 2022, the Order for Relief was entered, consolidating the two Aliera cases, with Case No. 21-11548 being the surviving case, and ordering that the cases be jointly administered [Bankruptcy Cases, Docket No. 75].

7.     The Aliera Trustee was appointed pursuant to an order entered by the Delaware Court [Bankruptcy Case, Docket No. 576] (the "Confirmation Order") confirming the *Modified First Amended Plan of Liquidation*, attached as Exhibit A to the Confirmation Order (together with all exhibits thereto, and as may be amended, modified or supplemented, the "Plan").   Pursuant to the Plan, the Aliera Trustee has standing to bring claims on behalf of the Aliera bankruptcy estates as well as the Aliera creditors pursuant to 11 U.S.C. § 544.

8.     The Sharity Trustee was appointed pursuant to the *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Plan of Liquidation of Sharity Ministries, Inc. Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 343] in Sharity's bankruptcy case.[2]   Pursuant to the Sharity Chapter 11 plan, the Sharity Trustee has standing to bring claims on behalf of the Sharity bankruptcy estate.

9.     Defendant American Medical is a Texas Limited Liability Company with its principal place of business in Texas and may be served by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to its Registered Agent, Thomas Ferguson, 7001 Blvd. 26, Suite 328 North, Richland Hills, TX 76180.

10.     Defendant Ferguson is an individual resident and citizen of Texas.   He can be served by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to his primary residence located at 4501 Cr 920, Crowley, TX 76036.

---

[2] *See In re Sharity Ministries, Inc.*, Bankr. Case No. 21-11001 (TMH).

11.     Between 2016 to 2021, American Medical and Ferguson, both individually and on behalf of American Medical as its principal, acted as a call center for Aliera, marketing and selling Aliera, Unity, and Sharity plans to thousands of Members throughout the country.

12.     This Court has jurisdiction to hear this matter pursuant to, without limitation, 28 U.S.C. §§ 157, 1331, and 1334 as the claims asserted herein arise in or relate to the bankruptcy cases of Aliera and Sharity.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

13.     The Court has subject-matter jurisdiction and personal jurisdiction over all the parties.  As a result of the Defendants' minimum contacts with the forum, the Defendants are subject to the personal jurisdiction of the Court.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1409(c). Pursuant to the Plan, the Aliera Trustee has standing to bring claims on behalf of Aliera's creditors under, without limitation, section 544(b) of the Bankruptcy Code.

15.     The statutory bases for the relief requested herein are 11 U.S.C. §§ 105(a) and 544 and Rules 7001 and 7018 of the Federal Rules of Bankruptcy Procedure as well as other applicable statutes and state laws.

16.     The Plaintiffs consent to entry of final orders or judgment by the Court.

## BACKGROUND

### I.    Introduction and Overview

17.     Aliera was incorporated in Delaware by Moses, Steele, and Chase (the "Insiders") in December 2015.  Before forming Aliera, Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with felony securities fraud (relating to a "pump and dump" scheme based on fraudulent statements) and perjury.  As a result of the criminal case, titled *United States v. Moses*, 1:04-cr-

00508-CAP-JMF (N.D. Ga.), Moses was sentenced to over six (6) years in prison and ordered to pay $1.65 million in restitution.[3]

18.     Aliera was a for-profit entity.  Its stated scope of business is "to engage in the business of providing all models of Health Care to the general public" and "to cultivate, generate or otherwise engage in the development of ideas or other businesses.  To buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders…."  Aliera's formation documents do not include any discussion of religious or ethical purposes or missions.  The Debtors were formed to provide services to HCSMs, including Sharity.  After disputes with other HCSMs, Sharity became the primary client and mechanism for the Insiders and the Defendants to extract cash from the Members.

19.     The Debtors began selling their health care products in late 2015.  At the time it was formed, Aliera only sold "direct primary care medical home" ("DPCMH") plans.  DPCMH plans generally cover limited services such as some doctors' visits and basic lab services.   These plans provide no hospitalization or emergency room coverage and are not ACA-compliant.

20.     The Insiders realized Aliera could greatly increase the sales of its health care products if it could take advantage of the federal statute that exempted taxpayers who purchased HCSM coverage from the ACA's individual mandate.  They realized also that Aliera could avoid insurance laws in many states that also have an exemption from insurance regulations for entities that meet those states' HCSM requirements.

21.     Anabaptist Healthshare ("Anabaptist") was a small Mennonite entity located in Virginia.  Anabaptist had been recognized by the federal Department of Health & Human Services'

---

[3] Steele caused Aliera to make the restitution payment on Moses' behalf.

Centers for Medicare & Medicaid Services as an HCSM that had met the requirements under 26 U.S.C. § 5000A.[4]

22.    In 2016, Moses convinced Anabaptist to permit Aliera to market its DPCMH plan "side by side" with Anabaptist's sharing program using Anabaptist's HCSM designation. Anabaptist created a wholly owned subsidiary, Unity, for that purpose and on February 1, 2017 Aliera entered into a contract with Unity.  Under that contract, Aliera would offer to the public its own health care products that did not meet the insurance benefits and coverage requirements under the ACA, and that did not independently qualify for the HCSM exemption under 26 U.S.C. § 5000A.  In return, Aliera's customers would join the Unity HCSM, increasing the membership in Anabaptist's HCSM.  Under the contract with Unity, Aliera was responsible for maintaining and segregating the assets received that were supposed to be reserved for payment of benefits to Unity members.

23.    Although Aliera, directly, as well as through the Defendants and other insurance brokers, marketed the plans to consumers throughout the country as HCSM plans through Unity, Aliera's own DPCMH plans were marketed as well.  Members made payments for both

---

[4] When Congress passed the ACA in 2010, it required all individuals to be covered by health insurance or pay a penalty.  Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A.  One of those exceptions was for members of existing HCSMs.  In order to qualify as an HCSM under the ACA, an entity must meet the following rigid requirements:

(1) it must be recognized as a 501(c)(3) tax exempt organization;
(2) its members must "share a common set of ethical or religious beliefs and share medical expenses among members according to those beliefs";
(3) its members must "retain membership even after they develop a medical condition";
(4) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999"; and
(5) it must be subject to an annual audit by an independent CPA and make that audit available to the public upon request.

26 U.S.C. § 5000A(d)(2)(B)(ii).  The reason for the 1999 cutoff date was to ensure the reliability of care that comes with historical practice, and to prevent "opening the flood gate" to groups seeking to circumvent the requirements of the ACA.  *Liberty Univ. v. Lew*, 733 F.3d 72, 102 (4th Cir. 2013).

components of the plan directly to Aliera, and Aliera unilaterally determined how much of the payment was designated for the Aliera component, what portion was designated for the Unity component of the plan, and how much of the payment would be used to actually pay Members' medical expenses.

24.     In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity discovered that Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval and had not properly maintained assets reserved for payment of benefits to the Members.  It requested an accounting and, in July 2018, demanded Aliera turn over control of all Unity funds.

25.     Unity terminated the relationship with Aliera in the summer of 2018.  A lawsuit between Aliera and Anabaptist Health Share/Unity was filed in Superior Court of Fulton County, Georgia in late 2018 styled *Aliera Healthcare v. Anabaptist Health Share, et al.,* No. 2018-cv-308981 (Hon. Alice D. Bonner, Ga. Sup. Ct.) (the "Georgia Lawsuit").  The court found that administrative fees paid to Aliera under its agreement with Unity amounted to millions of dollars. Indeed, an Aliera employee testified in the Georgia Lawsuit that Aliera earned more than $180,000,000 in revenue in 2018 alone.

26.     With its relationship with Unity terminating, Aliera would have no affiliation with any HCSM through which to sell its health care plans.  Aliera and its principals therefore created Trinity Healthshare, Inc. ("Trinity") on June 27, 2018, as a purported Delaware nonprofit entity.

27.     William Rip Thead, III became the CEO of Trinity.  Mr. Thead was an Aliera employee at the time it created Trinity.

28.     Aliera's law firm filed an application with the IRS for recognition of Trinity as a 501(c)(3) charitable organization and was authorized as power of attorney on behalf of Trinity in

connection with that application.  The application, signed by Mr. Thead as Trinity's chairman, failed to disclose the anticipated financial arrangement with Aliera, its employer.

29.     On or about August 13, 2018, Aliera signed an agreement with Trinity to provide the marketing, sale, and administration of the purported HCSM plans they created (the "2018 Agreement").  The 2018 Agreement was drafted by Aliera and its agents and was not an arm's length transaction.  It was signed by Chase on behalf of Aliera and by Mr. Thead on behalf of Trinity.

30.     The 2018 Agreement allowed Aliera to use Trinity's nonprofit status to sell health care plans purporting to be HCSM plans, and to maintain complete control over design of the plans, the money collected, the administration of the plans, the benefits paid, and the membership roster.  Under the 2018 Agreement, Trinity delegated to Aliera authority to provide accounting staff, financial and membership reporting, and audit and tax filing support.  It gave Aliera control over enrolling new members.  It also gave Aliera the "exclusive ownership rights to the Membership Roster," and provided that Trinity was "not authorized to contact any members or use any information contained in the Membership Roster for any purpose without the prior written consent of Aliera."  Aliera was granted authority in its sole discretion to "substitute any component of a Plan."  In other words, Trinity was just a front for Aliera.

31.     The payment scheme under the 2018 Agreement was especially prejudicial to the Members.  The Agreement provided that ***all Member "contributions" payments were to be made directly to Aliera***, which then allocated 30-40% (depending on the plan) of every payment to commissions, and also provided that Aliera would be paid substantial additional administrative fees.  Only a small fraction of the amount of a member contribution (about 16% of the amount

paid under most of the plans) was actually to be placed into a Trinity "Sharebox" account for the payment of claims.

32.   By contrast, under the ACA, health insurers may not spend more than 20% of premium payments on administrative costs, and 80% must be spent on benefits.  42 U.S.C. § 300gg-18.

33.   Due to the small percentage of the Members' payments eventually ending up in the Sharebox for payment of claims, there were insufficient funds to pay the Members' claims.  Aliera dealt with this problem by avoiding, delaying, or unreasonably denying payment of claims.  When the Members complained, Aliera's practice was, *inter alia*, to make false promises of payment, demand that medical providers resubmit medical records multiple times, or advise that it would "reprocess" the requests for payment.  Aliera never advised the Members, however, that there were insufficient funds to pay the claims because Aliera was siphoning off as much as 84% of the Members' monthly contributions for "administrative" costs.

## II.   Aliera Designs, Markets, and Sells Health Care Plans that Function as Health Insurance and Draws Scrutiny from State Regulators.

34.   Aliera designed and created the Trinity health care plans to be sold to the Members as "alternatives" to health insurance that mimicked traditional health insurance plans.   For example:

a.   It created "sell sheets" that laid out benefits and costs for various plans.  The more robust the plan and the lower the deductible (called a "Member Shared Responsibility Amount" or "MSRA"), the more a member paid.  Similarly, the cost of the plans increased as a Member aged and if the member smoked.

b.   It advertised the plans as "great for those who simply want to have peace of mind knowing that they will be able to receive the health care services they need when they need them," or as "allow[ing] members to achieve comparable cost assurances for catastrophic health care services (including preventative care and immediate access to doctors through office visits, urgent care, and telemedicine) at a much lower cost…."

c.  It identified health care expenses, such as in-patient and out-patient care, prescription benefits, preventive care, specialty care and hospitalization, that would be included after the MSRA or a copay was paid.

d.  It misrepresented that payments to Aliera and its claims practices were similar to those used in health insurance by offering a standard "comparison" of the terms used by Aliera to those used in standard insurance policy.  Hence, a premium was a "contribution," a deductible was a "Member Shared Responsibility Amount (MSRA)," and a co-pay was a "co-expense."

e.  Aliera called certain plans "Gold," "Silver," or "Bronze" plans, just as ACA-compliant health insurance plans are called.

f.  It created benefits booklets that outlined the benefits of the plan, the exclusion from coverage (described as "limits of sharing"), and the necessity of pre-authorization for certain medical expenses.

g.  The monthly premium payments that Aliera described as "voluntary contributions" were, in fact, mandatory if a member wanted to be eligible for coverage of health care costs, just like insurance premiums.

h.  The plans were sold by licensed insurance agents, such as the Defendants, who were offered outsized commissions for selling the Aliera/Trinity plans.

i.  Like an insurance company, Aliera made payments for covered eligible medical expenses directly to medical providers after receiving standard health insurance claims.  Members never sent payments directly to one another.

j.  The plans promised coverage for an expansive network of "in network" providers, and Aliera represented that it was affiliated with "a growing nationwide PPO network of more than 1,000,000 health care professionals and more than 6,000 facilities."

35.  The Members received a card that mimicked a health insurance card and were advised to keep it with them at all times to present to health care providers.

36.  Aliera and the Defendants marketed and represented these health care plans as HCSM plans, even though they knew that Trinity could not qualify as a legitimate HCSM under 26 U.S.C. § 5000A(d)(2)(B)(IV) for the following reasons:

a.  Trinity was created 15 years after December 31, 1999 and, at the time of its creation in 2018, had no members.  Under the federal statute, an entity or a predecessor of the entity must have "been in existence at all times since December 31, 1999, and

medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV). Trinity did not have members who had shared medical expenses "continuously and without interruption since at least December 31, 1999." Nor did Trinity have any predecessor entity. The application form submitted to the IRS by Aliera's attorney checked "No" to the question, "[a]re you a successor to another organization?"

b.    In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs…." 26 U.S.C. § 5000A(d)(2)(B)(III). Although Trinity's original bylaws, attached to its application to the IRS for recognition as a 501(c)(3) entity, set forth a specific set of Protestant Christian religious beliefs, Trinity never restricted its membership to those individuals who affirmed specific common beliefs. Members were only asked to affirm a generic "Statement of Beliefs" that refers to no particular religion. As stated in "frequently asked questions" on Trinity's website, "Trinity HealthShare welcomes members of all faiths who can honor the Statement of Beliefs, by which the Trinity HealthShare program operates." As a practical matter, the generic Statement of Beliefs allowed sale of the health care products to the general public.

c.    Although a CPA firm prepared an independent auditors' report of Trinity's finances for the six months it was in existence in the last half of 2018, it later withdrew that report. Trinity never subsequently completed a financial audit, as required by the statute.

37.    Aliera and the Defendants further misrepresented to the Members that Trinity was "recognized" as a qualified HCSM. It was, in fact, impossible for Trinity to have been "recognized" as such because the rule that provided such recognition was eliminated years before Trinity was created. Trinity has never appeared on any list of recognized HCSMs developed by the U.S. Department of Health and Human Services.

38.    Unsurprisingly, the Trinity health care plans Aliera created and sold prompted increasing complaints from consumers and attracted scrutiny from state regulators:

a.    As early as April 8, 2019, the State of Washington's Office of the Insurance Commissioner issued a final investigative report concluding that Trinity was not a valid HCSM and was acting as an unauthorized insurer in Washington. That Insurance Commissioner entered a Cease and Desist Order against Trinity and Aliera on May 13, 2019.

b. On June 13, 2019, the State of Texas filed suit against Aliera alleging that it was selling unauthorized insurance products in that state and seeking to enjoin its sale of those products in Texas.

c. Multiple other states have followed, including California, Colorado, Connecticut, District of Columbia, Iowa, Maryland, Michigan, New York, New Hampshire, New Jersey, New Mexico, Oregon, and Pennsylvania, all generally concluding that the plans were unauthorized insurance.

39. Several civil lawsuits were filed against Aliera claiming the health care plans sold through Trinity were unauthorized insurance, including:

a. *Jackson, et al., v. The Aliera Companies, Inc., Aliera Healthcare Inc., Trinity Healthshare Inc.*, No. 2:19-cv-1281 (J. Rothstein, W.D. Wash.);

b. *Duncan v. The Aliera Companies, Inc., Trinity Healthshare Inc., OneShare Health LLC*, No. 2:20-cv-867-TLM-KJM (J. Nunley, E.D. Cal.);

c. *Kelly, et al. v. The Aliera Companies, Inc, Trinity Healthshare Inc.*, No. 3:20-cv-05038-MDH (J. Harpool, W.D. Mo.);

d. *Smith, et al., v. The Aliera Companies, Inc., Trinity Healthshare Inc, OneShare Health LLC*, No. 1:20-cv-02130-RBJ (J. Jackson, D. Colo.); and

e. *Albina, et al. v. The Aliera Companies, Inc. Trinity Healthshare Inc., OneShare Health LLC*, No. 5:20-cv-496-JMH (J. Hood, E.D. Ky.).

40. Aliera claimed in these proceedings that the Trinity HCSM plans were not insurance because neither Aliera nor Trinity had any obligation to indemnify the Members for medical claims out of their own money, and instead, all medical expenses were to be "shared" from the Members' funds. Nevertheless, it was Aliera who determined which part of the Members' payments would be siphoned off to pay itself and which part would be placed in a fund to pay the expenses. Aliera was the claims administrator for the plans. Providers' bills were submitted to Aliera for payment, and Aliera decided whether and when claims would be paid. When the Members had concerns about claims that were not paid, they called an Aliera representative.

41.     To prolong the scheme, Aliera delayed resolution of the substantive issues in the lawsuits by claiming that an arbitration clause in the back of the Trinity member guides required a multi-step dispute resolution process culminating in binding arbitration in Georgia.  Even after courts found the arbitration clauses unenforceable, Aliera appealed the decisions to further delay substantive judicial scrutiny of its illegal practices.

42.     During this time, the Defendants continued to market and sell Aliera's plans to members.

**III.     Aliera Used the Defendants as Middlemen to Participate In and Further the Fraudulent Scheme.**

43.     In marketing its plans, Aliera had employed a network of sales agents, including the Defendants.

44.     On or around August 16, 2016, Debtor Ensurian f/k/a Aliera Healthcare of Georgia, LLC and Ferguson, on behalf of American Medical, executed a call center agreement whereby the Defendants agreed to, without limitation, provide certain marketing services to prospective customers and insureds on behalf of Aliera and solicit enrolment forms and contract applications for certain Aliera/Unity products (the "Call Center Agreement").

45.     Pursuant to the Call Center Agreement, the Defendants were entitled to payments of fees and commissions for each plan sold.  The Defendants received a 30% commission payment for each Aliera/Unity plan sold.  Aliera's obligations under the Call Center Agreement (the "Obligations") were fraudulent obligations.

46.     In addition to executing the Call Center Agreement, Aliera provided trainings and instructions for how the Defendants should sell the plans.  Using the materials provided by Aliera, the Defendants misled potential members with respect to the type of plans in which they were

enrolling and did not explain to the Members how these plans actually worked or clarify that these plans did not guarantee any actual payment of medical expenses.

47.     Aliera's online enrollment forms and applications for the Members to sign when they enrolled in the plans similarly misrepresented that "up to 40% of your member contribution goes towards the administration of this plan and other general overhead costs to successfully carry out the duties of administering these services."

48.     In fact, up to 84% of the contributions went to administration and other costs, such as commission payments to the Defendants and personal payments to the Insiders.

49.     At no time did Aliera or the Defendants disclose that the amount of a member's contribution that would remain, after payment of all administrative and other costs, for deposit into the Sharebox for payment of member claims would be woefully insufficient to pay the reasonably likely amount of a member's claims.

50.     From 2016 forward, the Defendants sold Aliera's plans nationally and continued to receive commission payments at 30% of the contribution of each plan sold, a rate that is significantly greater than commissions for standard health plans and insurance, which typically averages between 5% to 10%.

51.     The Defendants never inquired into Aliera's policies and would continue to mislead the Members in order to receive excessive commissions.  Upon information and belief, the commission payments the Defendants received from Aliera were unrealistically high in comparison to commissions received from other clients, not to mention that the amount of commission payments caused Aliera to exceed the medical-loss ratio required under the ACA. Pursuant to the ACA, only 20% or less of a company's revenue from insurance premiums on

medical care can go toward administrative costs, which includes agent and broker commission. 42 U.S.C. § 300gg-18.

52.     The amount of fees and commissions the Defendants would receive for each sale was outlined in the agreements.  Further, American Medical, as a nationwide insurance agency, and Ferguson, as president of a nationwide insurance agency, have worked with a large variety of insurance carriers to sell various insurance plans.  Thus, the Defendants knew or should have known that the alleged commission payments from Aliera did not reflect standard, legitimate commission payments for the sale of valid insurance plans.

53.     The Defendants ignored clear signs and "red flags" that the Insiders were causing Aliera to operate a Ponzi scheme.

**IV.    Aliera Restructures Itself to Mask Its Control of Trinity but Maintains Control Over Trinity and Continues to Misrepresent the Plans it Sold.**

54.     Despite the cascade of regulatory actions and lawsuits against it, Aliera continued to aggressively sell the Trinity plans and continued to pay the Defendants exorbitant fees to do so.

55.     In addition, Aliera reacted by attempting to superficially distance itself from Trinity while still controlling Trinity.  Its protestations to courts and regulators that it was merely an administrator for Trinity, however, were misleading.

56.     After the first regulatory actions commenced, the Aliera principals hand-picked another person to become a Trinity insider.  Chase, Moses, and Mr. Thead met William Guarino at an insurance legislators conference in June 2019.  They recruited him to serve as Trinity's president, only its second employee, and as a third board member.

57.     Aliera created four subsidiary entities — Debtors Ensurian f/k/a Aliera Healthcare of Georgia, LLC, Advevo, Tactic Edge, and USA Benefits (collectively, the "Subsidiaries" and each, a "Subsidiary") — and changed its name from Aliera Healthcare, Inc. to The Aliera

Companies, Inc. in 2019. Aliera divided the various tasks it was performing directly under the 2018 Agreement among these four Subsidiaries. All four Subsidiaries had their principal places of business at 990 Hammond Drive, Atlanta, Georgia, which was also Aliera's principal place of business.

58.     Mr. Thead signed, on behalf of Trinity, five agreements with the new Aliera Subsidiaries, all effective January 1, 2020 ("Subsidiary Agreements"). These Subsidiary Agreements divided the tasks delegated to Aliera in the 2018 Agreement as follows:

a.     Ensurian, which had obtained a license as an insurance agency, was granted the exclusive right to market and sell the Trinity health care plans. Trinity granted Ensurian the non-assignable right to purchase Trinity's membership list in the event there was a change in the majority of the Trinity board of directors.

b.     USA Benefits was to administer all claims, prepare and send member cards and other materials that were provided to members, provide explanations of benefits to members and providers, maintain a process for receipt of member complaints, handle accounting, and furnish Trinity with information it needed to prepare its annual audit and Form 990 tax returns.

c.     Tactic Edge developed and owned the software and IT platform and maintained the databases of member enrollment and payments. Under this agreement, it "licensed" access to its system to Trinity.

d.     Under an "Ancillary Agreement" with Tactic Edge, that entity would handle customer complaints and would provide coordination and communication with regulators.

e.     Advevo was to provide marketing and brand development services.

59.     Aliera and its Subsidiaries rebranded the member materials, including sell sheets, member guides, enrollment forms, member cards, web portals, and explanations of benefits, to remove its own name and replace it with the Trinity or, after Trinity changed its name, the Sharity name. The materials nevertheless were all created by Aliera or one of its Subsidiaries. The administration of all the Members' claims and handling of the Members' complaints continued to be by employees of Aliera or one of its Subsidiaries, even though telephone calls and emails would

be from accounts nominally in the Trinity/Sharity name.  Emails sent to the Members under the "Trinity" or "Sharity" name were in fact sent by Aliera or one of its Subsidiaries.  Newsletters sent to the Members under the Trinity/Sharity name were created and sent by an Aliera Subsidiary.

60.     From the time Trinity was created until early 2021, Aliera had sole control over all payments made by the Members, of the costs deducted from the payments, of the amounts deposited into the Trinity account for payment of medical claims, and of the amount paid out of the Sharebox account for the Members' medical expenses.  Although the Members paid approximately **$363,000,000** in monthly member fees and application fees for their Trinity health care plans, Trinity never had more than three employees.

61.     A fee schedule was attached to each of these Subsidiary Agreements that allowed the Subsidiaries to be paid an amount from each member's monthly premium payment, with the amount dependent on the amount of the member's payments, such that the larger the member's monthly payment, the larger the fee paid to the Subsidiary.

62.     The Members' payments continued to go directly to Aliera or a Subsidiary, and the fees were deducted before any of the Members' payments were deposited into Trinity's Sharebox account for payment of claims.  Under these contracts, the Subsidiaries paid themselves 58-60% of the Members' payments.  The Defendants were continuing to receive around 30% commission on each of the Members' payments.

63.     By the time Sharity filed its bankruptcy petition, Aliera, with the help of the Defendants, had enrolled over 98,000 Members[5] in the Sharity health care plans.  Yet, Sharity's Sharebox account remained woefully inadequate to pay the Members' medical claims as they came due.  As of the petition date, the total amount of the gross unpaid claims was in excess of

---

[5] There were 98,892 unique households that purchased Sharity health care plans.  Many plans also had dependents in addition to the primary member enrolled in the plan, such that a total of 159,307 individuals were enrolled in the plans.

$250,000,000, but Sharity held only approximately $743,000 in its Sharebox account for payment of the Members' medical claims.

64.    Based on a board presentation, by August of 2020, Sharity showed a negative $1.2 million in net assets "with a negative net worth/assets and continuing lawsuits." Accordingly, its liabilities far exceeded its assets.

65.    Sharity itself filed a Chapter 11 case which is being administered by the Delaware Court. Before the bankruptcy, various governmental units and private parties brought investigations, claims, or lawsuits against the Debtors and Sharity, alleging, among other things, that Sharity's health plans were unauthorized health insurance and not HCSM plans. Those cases alleged that the payments to the Debtors were in excess of amounts appropriately allowed for such services and, as such, left very little available to be used to pay the Members' requests for sharing of medical expenses, *i.e.,* Sharity's professed raison d'être. A number of courts and/or agencies issued orders against the Debtors and/or Sharity requiring them to cease and desist from offering health care sharing programs and withdrawal from the health care markets in a number of states.

**V.    Aliera Created Trinity Knowing that It Would Fail and the Defendants Reaped the Benefits of this Fraudulent Scheme.**

66.    Aliera created the Trinity health care plans and determined the amount of monthly payments the Members would pay under each plan. It set the prices at rates that were substantially less than traditional ACA-compliant health insurance plans in order to make the plans appear attractive to purchasers, while advertising the plans as providing comparable benefits to those health insurance plans.

67.    Aliera's goal was to continually enroll as many members as possible in order to generate as much monthly revenue as possible and the Defendants were encouraged to further that goal.

68.     Although the enrollment forms Aliera created asked potential members whether they had any medical issues, upon information and belief, it had the policy of not denying membership to anyone who applied.  In fact, the Defendants would reassure the Members that in light of a preexisting condition it was still able to enroll and benefit from the Aliera/Trinity plans.

69.     At the time Sharity filed its petition for bankruptcy, Aliera or its Subsidiaries were retaining up to 60% of the Members' fees and were continuing to increase the commission payments provided to the Defendants but were providing little value to the Members in return. Sharity also received approximately 10% of the Members' payments to cover expenses, consisting primarily of defense in lawsuits and regulatory actions.  As a result, only about 30% of the Members' payments were actually deposited into Sharity's Sharebox account for payment of claims.

70.     Health insurers are required to pay at least 80% of premiums received on member claims for ACA-compliant plans under federal law, 42 U.S.C. § 300gg-18.  Aliera had the ratio upside down, setting aside at most 30% of the Member premiums for payment of claims.

71.     Aliera, its officers and directors, and the Defendants never advised the Members that Sharity would be unable to pay all medical claims but instead continued to collect member payments and sell new plans.

72.     Even though the amount remaining for deposit into Sharity's Sharebox account, after payment of Aliera's and its Subsidiaries' fees and the Defendants' commission payment, was woefully inadequate to pay the Members' medical claims, Aliera and the Defendants maintained the scheme to defraud members by continuing to aggressively sell the plans to new members, thus generating larger revenue, while at the same time Aliera continued to arbitrarily deny or delay payment of claims.

73.     At the time Sharity filed its petition for bankruptcy, Sharity Members learned for the first time from Aliera that there were claims totaling over $50 million from the Members that had been approved for payment but had not yet been paid.  That figure, however, revealed only a small part of the problem, because it did not include claims that had been submitted but were not yet approved or that had been arbitrarily denied.  When those medical claims are added in, the total amount of the gross unpaid claims is in excess of $250,000,000.  Meanwhile, at the time of Sharity's bankruptcy filing, Sharity held only approximately $743,000 in its Sharebox account for payment of the Members' medical claims.

74.     The Aliera/Sharity scheme was essentially a Ponzi scheme, with the Members acting as investors.  Like all Ponzi schemes in which payments to earlier victims are paid from funds collected from newer victims, Aliera's scheme eventually failed.

75.     Sharity filed its petition for bankruptcy, and thousands of Members were left without health insurance and with huge unpaid medical bills.  Many Members are now being, or have been, pursued by their health care providers for the unpaid bills.

76.     A judgment was entered against Aliera on November 11, 2021, in *Jackson, et al. v. The Aliera Companies, Inc., et al*., Case No. 2:19-cv-01281-BJR, in the U.S. District Court for the Western District of Washington, in favor of a plaintiff class, for $20,646,077.08, and in favor of the individual named plaintiffs in the aggregate amount of $22,631, plus exemplary damages in the amount of $706,750.  In entering the judgment, the court expressly found that Aliera had designed, marketed, and sold unauthorized and illegal health insurance, violated Washington's Consumer Protection Act, and that the plaintiffs had suffered damages as a result of illegal and fraudulent practices.  A judgment was entered against Aliera on November 17, 2021, in *Albina, et al. v. The Aliera Companies, et al.*, Case No. 5:20-CV-00496-JMH, in favor of one of the named

plaintiffs in the amount of $16,255.54 and in favor of the class in the amount of $4,679,868.46.  In

entering the judgment, that court expressly found that "Aliera misled the Members into entering

contracts for a product that was not what it purported to be and did not comply with applicable

federal or state law."

## VI.    Aliera's Insolvency

77.    Aliera was insolvent since its inception.

78.    The Debtors were insolvent as, without limitation, the value of their liabilities

exceeded the value of their assets and the Debtors did not have adequate capital.

79.    As of December 31, 2017, Aliera had assets valued at $16,348,278 and liabilities

of $15,730,947 according to its 2017 audit.

80.    As of December 31, 2018, Aliera had assets valued at $65,369,378 and liabilities

of $57,287,961 according to its 2018 audit.

81.    However, the liabilities reflected in these audits did not include liabilities owing to

Sharity and the Members as a result of the fraudulently obtained funds, which amounts far

exceeded any stockholders' equity.

82.    As examples of these additional liabilities, the *Jackson* class received a judgment

against Aliera in the amount of $20,646,077.08, which reflected liabilities not included in the 2017

or 2018 audit.

83.    Additionally, the *Albina* class received a judgment against Aliera in the amount of

$4,679,868.46, which reflected liabilities not included in the 2017 or 2018 audit.

84.    Taking these, and additional liabilities (including, without limitation, those

resulting from claims of the Members) not accounted for in any of Aliera's audits, it is clear that

Aliera's liabilities far exceeded the value of its assets at a fair valuation.

85.     All of Aliera's assets were obtained using funds derived from Unity, Sharity, and the Members on a fraudulent basis, thereby creating a claim against Aliera for each dollar it received.  Accordingly, its liabilities far exceeded its assets.

**VII.    The Defendants' Fraudulent Commission Transfers**

86.     Aliera paid grossly excessive compensation to the Defendants, averaging around 30% per sale throughout the course of its relationship with the Defendants.

87.     Aliera transferred not less than $443,709.44 to American Medical and/or Ferguson as alleged compensation for the sale of Aliera and Sharity plans between 2018 and the Petition Date (collectively, with all other transfers made to or for the benefit of the Defendants, the "Transfers").  A summary of the Transfers is attached hereto as **Exhibit A**.

88.     The Transfers were framed as commission payments, but these payments were far in excess of the value of services that the Defendants may have actually provided to the Debtors. In reality, the Defendants provided no consideration, or inadequate consideration, to Aliera, Sharity, or the Members in exchange for the Transfers as the Transfers were made in furtherance of the fraudulent scheme.

89.     The Transfers were made while the Debtors were insolvent, not made in exchange for reasonably equivalent value, and are subject to forfeiture to the Debtors' estates.

**CLAIMS FOR RELIEF**

90.     The following causes of action are asserted against the Defendants without prejudice to any rights the Plaintiffs or the Debtors may have against the Defendants and any third parties, or which this Court may grant to the Plaintiffs or the Debtors, to assert additional causes of action or allegations based on facts disclosed in documents or other information made available to the Plaintiffs or the Debtors or developed as a result of discovery or otherwise.

91.    All conditions precedent to the maintenance of this action, the filing of this Complaint, and to the following claims have been performed, been waived, satisfied, have occurred, or have otherwise been met.

### COUNT I:
### VOIDABLE TRANSFERS AND OBLIGATIONS – CONSTRUCTIVE FRAUD
(11 U.S.C. § 544(b) and O.C.G.A. § 18-2-75(a))

92.    The Plaintiffs restate and incorporate herein by reference the allegations contained in paragraphs 1 through 91 above.

93.    Pursuant to 11 U.S.C. § 544, the Aliera Trustee brings this claim on behalf of the Debtors' estates and their creditors under the Georgia Uniform Voidable Transfer Act, O.C.G.A. §§ 18-2-75, *et seq.*[6]

94.    Aliera has one or more creditors for whom the Aliera Trustee can act whose claim arose before or within a reasonable time after the obligation was incurred, including the Members.

95.    Under O.C.G.A. § 18-2-75, "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

96.    Aliera made transfers or incurred obligations in the form of commission payments for the benefit of the Defendants.  These fraudulent transfers include, without limitation, the Transfers.  The fraudulent obligations include, without limitation, the Obligations.

---

[6] Pursuant to O.C.G.A. § 18-2-80(b), "a cause of action in the nature of a claim for relief under [the Uniform Voidable Transactions Act] is governed by the law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred.  The Debtors' chief executive office and principal place of business was located at 990 Hammond Drive, Atlanta, Georgia, and thus the Debtors were located in Georgia when the obligations for each of the transfers was incurred pursuant to O.C.G.A. § 18-2-80(a).  Accordingly, the causes of action regarding all avoidable transfers are governed under both Bankruptcy and Georgia law.

97.     Aliera (a) received less than a reasonably equivalent value in exchange for the Transfers and Obligations, and (b)(i) was insolvent on the date of each of the Transfers and Obligations, or became insolvent as a result of each of the Transfers and Obligations; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Aliera was an unreasonably small capital; or (iii) intended to incur, or believed that Aliera would incur, debts that would be beyond Aliera's ability to pay as such debts matured.

98.     Further, because the Defendants' services to the company, in whatever form, were premised on maintenance and perpetuation of a fraudulent scheme, they did not contribute value in exchange for the Transfers received and Obligations incurred.

99.     Aliera made the Transfers, and incurred the Obligations, within four (4) years of the Petition Date.

100.     The Transfers and Obligations incurred constitute transfers of interests of Aliera in property.

101.     At the time the Transfers were made and the Obligations were incurred, there existed one or more actual and/or future creditors of Aliera holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

## COUNT II:
## VOIDABLE TRANSFERS AND OBLIGATIONS – ACTUAL FRAUD
### (11 U.S.C. § 544(b) and O.C.G.A. § 18-2-74(a)(1))

102.     The Plaintiffs restate and incorporate herein by reference the allegations contained in paragraphs 1 through 91 above.

103.     Pursuant to 11 U.S.C. § 544, the Aliera Trustee brings this claim on behalf of the Debtors' estates and their creditors under O.C.G.A. §§ 18-2-74, *et seq.*

104.    Aliera made transfers for the benefit of the Defendants.  These fraudulent transfers include but are not limited to the Transfers.

105.    The Transfers were made, and the Obligations were incurred, with the actual intent to hinder, delay, or defraud entities to which Aliera was obligated to, or became obligated to, on or after the date of such transfers.

106.    The Transfers and Obligations constitute transfers of interests of Aliera in property.

107.    The Transfers were made, and the Obligations were incurred, within four years (4) before the Petition Date.

108.    At or around the time that Aliera made the Transfers and incurred the Obligations, the Debtors were being sued or threatened with suits, including but not limited to the cease and desist complaints in multiple states and class action litigation.

109.    The Transfers were made, and the Obligations were incurred, to or for the benefit of the Defendants in furtherance of a fraudulent scheme.

110.    Aliera did not receive reasonably equivalent value in exchange for the Transfers or the Obligations.

111.    Aliera was insolvent as a result of and prior to the Transfers and the Obligations.

112.    The Aliera Trustee is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(1) and 18-2-77(a), avoiding the and the Obligations.

113.    At the time the Transfers were made, and the Obligations were incurred, there existed one or more actual and/or future creditors of Aliera holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

26

**COUNT III:**
**VOIDABLE TRANSFERS AND OBLIGATIONS AS TO PRESENT**
**OR FUTURE CREDITORS**
(11 U.S.C. § 544(b) and O.C.G.A. § 18-2-74(a)(2))

114.    The Plaintiffs restate and incorporate herein by reference the allegations contained in paragraphs 1 through 91 above.

115.    Pursuant to 11 U.S.C. § 544, the Aliera Trustee brings this claim on behalf of the Debtors' estates and their creditors under O.C.G.A. §§ 18-2-74, *et seq.*

116.    Aliera made transfers or incurred obligations for the benefit of the Defendants. These fraudulent transfers and obligations include but are not limited to the Transfers and Obligations.

117.    The Transfers and Obligations constitute transfers of interests of Aliera in property.

118.    At or around the time at which the Transfers were made, and the Obligations were incurred, Aliera was engaged or was about to be engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

119.    At or around the time at which the Transfers were made and the Obligations were incurred, Aliera intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

120.    The Aliera Trustee is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(2) and 18-2-77(a), avoiding the Transfers and the Obligations.

121.    At the time the Transfers were made, and the Obligations were incurred, there existed one or more actual and/or future creditors of Aliera holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

## COUNT IV:
## RECOVERY OF TRANSFERS
(11 U.S.C. §550)

122.     The Plaintiffs restate and incorporate herein by reference the allegations contained in paragraphs 1 through 91 above.

123.     Pursuant to § 550 of the Bankruptcy Code, in a fraudulent transfer action commenced under §§ 544 and 548 of the Bankruptcy Code, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

124.     The Transfers are avoidable pursuant to sections 544 and 548 of the Bankruptcy Code.

125.     Pursuant to 11 U.S.C. § 544, the Aliera Trustee brings this claim on behalf of the Debtors' estates and their creditors under O.C.G.A. §§ 18-2-74, *et seq.*

126.     The Transfers were made to or for the benefit of the Defendants in furtherance of a fraudulent scheme.

127.     The Defendants were the initial transferees of the Transfers or the immediate or mediate transferees of such initial transferee or the person for whose benefit the Transfers were made.

128.     The Aliera Trustee is entitled to a judgment against the Defendants in an amount of the Transfers pursuant to 11 U.S.C. § 550, for the respective amounts transferred, plus interest thereon at the legal rate from the date of the filing of this Complaint.

## COUNT V:
## PRESERVATION OF AVOIDED TRANSFERS
### (11 U.S.C. § 551)

129.    The Plaintiffs restate and incorporate herein by reference the allegations contained in paragraphs 1 through 91 above.

130.    Pursuant to § 551 of the Bankruptcy Code, any transfer avoided is preserved for the benefit of the estates, but only with respect to property of the estates.

131.    As a result of the foregoing, the Aliera Trustee is entitled to a judgment pursuant to sections 544, 548, 550(a) and 551 of the Bankruptcy Code (a) avoiding and preserving each of the Transfers to the Defendants and (b) directing that those Transfers be set aside.[7]

## COUNT VI:
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (The Aliera Trustee Against the Defendants)

132.    The Plaintiffs restate and incorporate herein by reference the allegations contained in paragraphs 1 through 91 above.

133.    The Defendants aided and abetted Aliera's directors and officers in breaching their fiduciary duties.  Aliera's Board of Directors owed fiduciary duties of due care, good faith, and loyalty to Aliera.

134.    Additionally, because the transactions at issue occurred while Aliera was insolvent or in the zone of insolvency, Aliera's directors and officers owed fiduciary duties of due care, good faith, and loyalty to Aliera's creditors.  Aliera's directors and officers breached their fiduciary duties to Aliera through, among other things, operating a false HCSM that caused the Members' payments to be paid to the Debtors; marketing and representing Trinity health care plans as HCSM plans, even though it knew that Trinity could not qualify as a legitimate HCSM; misrepresenting

---

[7] With respect to Counts I-V, should additional transfers or transferees be discovered, the Plaintiffs reserve the right to seek leave from the Court to amend the Complaint and name such transferees as Defendants in this action.

to the Members that "up to 40% of your member contribution goes towards the administration of this plan and other general overhead costs to successfully carry out the duties of administering these services;" transferring some or all of those funds to the Insiders and the Defendants; and rendering Sharity insolvent and unable to pay the Members' medical expenses and resulting in Aliera's arm's length creditors not receiving payment on their claims.

135.    The actions or inactions of Aliera's Board of Directors were taken in bad faith and constituted willful and wanton misconduct and/or gross mismanagement that caused the Debtors to suffer damages.

136.    The Defendants induced, assisted, ratified, and/or encouraged breaches of fiduciary duties by Aliera's directors and officers.  The Defendants entered into a scheme designed to profit off of Aliera's directors' and officers' breaches of fiduciary duties and procured those breaches by marketing and representing Trinity health care plans as HCSM plans, even though they knew that Trinity could not qualify as a legitimate HCSM, to enable and effectuate the plan of fraudulently diverting the Members' payments to Aliera.  The Defendants profited financially from their actions and from these breaches.

137.    The Defendants were aware that Aliera's directors and officers owed fiduciary duties, and also knew that the actions of Aliera's directors and officers as described above constituted a breach of their fiduciary duties.

138.    By continuing to sell the fraudulent HCSM plans for Aliera, the Defendants knowingly participated in that breach.  The Defendants' actions caused loss and damages to Aliera, its creditors, and the Members.

139.    Accordingly, the Aliera Trustee is entitled to a judgment against the Defendants for their aiding and abetting breach of fiduciary duties of Aliera's officers and directors and damages in an amount to be proven at trial.

## COUNT VII:
## CIVIL CONSPIRACY
(The Aliera Trustee Against the Defendants)

140.    The Plaintiffs restate and incorporate herein by reference the allegations contained in paragraphs 1 through 91 above.

141.    The Defendants, acting in concert with the directors and officers of Aliera, engaged in various forms of wrongful and tortious conduct, including, without limitation, converting the Debtors' funds for their own personal use and benefit through acceptance of unreasonably high commission payments as well as aiding and abetting breaches of the fiduciary duty Aliera's directors and officers owed to Aliera.

142.    Aliera's directors and officers owed fiduciary duties of due care, good faith, and loyalty to Aliera.  Additionally, because the transactions at issue occurred while Aliera was insolvent or in the zone of insolvency, Aliera's directors and officers owed fiduciary duties of due care, good faith, and loyalty to Aliera and its creditors.

143.    The Defendants conspired with Aliera's directors and officers to breach their fiduciary duties, and Aliera's directors and officers actually did breach their fiduciary duties in furtherance of this conspiracy by allowing Aliera, a for-profit, non-HCSM company, to market the HCSM plans and to retain over 80% of the payments the Members paid to Sharity for their personal benefit.  By actively marketing the HCSM plans and misrepresenting to the Members that these plans constituted valid HCSM plans of which only 40% of their member contribution went towards administration and overhead, the Defendants knowingly participated in that breach.

144. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Aliera's directors' and officers' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the company's operations and financial condition in order to retain as many proceeds as possible for the Insiders' and the Defendants' personal benefit. They accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully or recklessly releasing incorrect statements regarding Sharity's HCSM status in exchange for unreasonably high commission payments.

145. The Defendants' tortious conduct caused loss and damage to Aliera, its creditors, and the Members.

146. Accordingly, the Aliera Trustee is entitled to a judgment against the Defendants for its conspiracy and damages in an amount to be proven at trial.

## COUNT VIII:
## GEORGIA RICO
(The Sharity Trustee against the Defendants)

147. The Plaintiffs restate and incorporate herein by reference the allegations contained in paragraphs 1 through 91 above.

148. O.C.G.A. § 16-14-2, the Georgia RICO statute, provides that it is unlawful for any person, through a pattern of racketeering activity or with the proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money. It is unlawful for any person employed by or associated with any enterprise to participate in such enterprise by engaging in a pattern of racketeering activity.

149.   "Pattern of racketeering activity" is defined as engaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents.  O.C.G.A. § 16-14-3(4).

150.   "Racketeering activity" is defined as committing, attempting to commit, soliciting, coercing, or intimidating another person to commit any of a number of Georgia criminal offenses, including insurance fraud.  O.C.G.A. § 16-14-3(5)(A)(xxxviii).

151.   The Defendants have (1) conspired to siphon off membership funds through a series of fraudulent transfers, (2) interfered in the contractual relations between the Members and Trinity/Sharity, (3) marketed the HCSM plans as valid insurance, (4) misrepresented to the Members that these plans constituted valid HCSM plans, and (5) unlawfully retained the funds provided from Sharity to Aliera.

152.   The Defendants' actions were committed for financial gain as demonstrated by the unreasonably large commission payments.

153.   These actions harmed Sharity in its business, and more importantly, caused harm to Sharity and its Members.

154.   Accordingly, the Sharity Trustee is entitled to a judgment against the Defendants for their engagement in a pattern of racketeering activity and damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that this Court grant judgment as follows:

(a)   Enter judgment against the Defendants for all actual and punitive damages;

(b)     Declare the Transfers and the Obligations to be avoided, and award judgment against the Defendants in the amounts indicated above;

(c)     Award pre-judgment and post-judgment interest;

(d)     Pursuant to 11 U.S.C. § 502(d) disallow any claim of the Defendants against the Debtors; and

(e)     Grant such other and further relief to the Plaintiffs as may be just and proper.

Dated:  February 15, 2024
Atlanta, Georgia                                  Respectfully submitted,

**GREENBERG TRAURIG, LLP**

*/s/ John D. Elrod*
John D. Elrod, Ga. Bar No. 246604
Allison McGregor, Ga. Bar No. 860865
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2259
Facsimile: (678) 553-2269
Email: ElrodJ@gtlaw.com
        Allison.McGregor@gtlaw.com

*Counsel for the Plaintiffs*