

**IT IS ORDERED as set forth below:**

**Date: October 23, 2024**

_____
**James R. Sacca**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re:<br><br>THE ALIERA COMPANIES, INC. d/b/a Aliera Healthcare, Inc., *et al.*,[1]<br><br>Debtors. | **Case No. 21-11548 (TMH)**<br>Currently pending in the U.S. Bankruptcy Court for the District of Delaware |
| ALIERA LT, LLC, AS LIQUIDATING TRUSTEE FOR THE ALIERA COMPANIES, INC. D/B/A ALIERA HEALTHCARE INC., ET AL. and NEIL F. LURIA, IN HIS CAPACITY AS THE TRUSTEE OF THE SHARITY MINISTRIES, INC., LIQUIDATING TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN MEDICAL PLANS, LLC and THOMAS S. FERGUSON,<br>Defendants. | **Adversary Proceeding No**. 24-05031-JRS |

---

[1] The jointly administered Debtors in these Chapter 11 cases along with the last four digits of their federal tax identification number include: The Aliera Companies Inc. (9555) (Case No. 21-11548), Advevo LLC (6736) (Case No. 22-10124), Ensurian Agency LLC (3244) (Case No. 22-10123, Tactic Edge Solutions LLC (2923) (Case No. 22-10122) and USA Benefits & Administrators LLC (5803) (Case No. 22-10121).

## <u>ORDER ON MOTION TO DISMISS</u>

The Plaintiffs here are trustees of liquidation trusts for the benefit of creditors established pursuant to confirmed Chapter 11 plans of liquidation in *In re The Aliera Companies, Inc., et al* (collectively, "Aliera") and *In re Sharity Ministries, Inc. f/k/a Trinity Healthshares, Inc.*[2] ("Sharity" or where more applicable, "Trinity"). They have filed an action against American Medical Plans, LLC ("American Medical") and Thomas Ferguson ("Ferguson," and collectively with American Medical, the "Defendants") seeking to recover damages to the debtors' estates in excess of $425,000 on account of Defendants' alleged participation in a massive fraud scheme involving the sale of purported healthcare plans under the guise of a healthcare sharing ministry ("HCSM"). Defendants, health insurance brokers, allegedly played a critical role in the marketing and sale of these fraudulent health insurance-like products to individual consumers ("Consumer Members").[3] This is one of more than 30 adversary proceedings filed by the Plaintiffs against brokers for their alleged participation in this scheme.

Plaintiffs consist of Aliera LT, LLC, as Liquidating Trustee under the Liquidation Trust Agreement (the "Aliera Trust Agreement") for Aliera (the "Aliera Trustee"), and Neil F. Luria, in his capacity as the Trustee of the Sharity Ministries, Inc. Liquidating Trust (the "Sharity Trustee", and collectively with the Aliera Trustee, the "Trustees"). In addition to the Aliera Trustee seeking to recover

---

[2] *See In re Sharity Ministries, Inc.*, No. 21-11001 (Bankr. D. Del. July 8, 2021).
[3] These Consumer Members should not be confused with "members" of a limited liability company who made investments or had an ownership interest in a company.

fraudulent transfers under Georgia law from Defendants, it also asserts Georgia common law tort claims. The Sharity Trustee asserts a claim arising under the Georgia RICO statute against Defendants. Defendants have filed a Motion to Dismiss (the "Motion") the Georgia common law tort claims and the Georgia RICO claim, wherein it argues the Trustees lack standing to bring the claims, the claims are barred by *in pari delicto*, and the Trustees fail to state claims upon which relief can be granted. Defendants have also moved to dismiss the Aliera Trustee's fraudulent transfer claims for lack of standing or, in the alternative, that the Trustees be required to provide a more definite statement as to those claims.

## MOTION TO DISMISS STANDARD

When assessing a Rule 12(b)(6) motion, the Court assumes the truthfulness of "well-pleaded factual allegations" in the Amended Complaint (ECF No. 7) "and then determines whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court construes those well-pleaded, plausible facts "in the light favorable to the plaintiff." *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). Likewise, when ruling on a motion to dismiss for lack of standing, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As such, the "plausibility standard" is less than a probability requirement, "but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Additionally, the Court "may consider the exhibits attached to the complaint." *Dalziel Dalzeal LLC v. Mellberg*, No. 22-10625, 2024 WL 470363, at *3 (11th Cir. Feb. 7, 2024) (citing *Turner v. Williams*, 65 F.4th 564, 583 n.27 (11th Cir. 2023) ("[C]ourts . . . consider the four corners of a complaint and the complaint's attached exhibits when analyzing a Rule 12(b)(6) motion to dismiss.")). Therefore, the following recitation of allegations from the Amended Complaint are not findings of fact by the Court. In addition, the Court has also included facts that are matters of public record in the *Aliera* and *Sharity* cases to provide further context for its ruling on the Motion. The Court will now summarize the allegations in the Amended Complaint and public record for purposes of this Motion.

## BACKGROUND

### I. Factual Allegations in the Amended Complaint

#### A. Background of Aliera and Trinity

In 2015, Aliera was incorporated in Delaware by a convicted felon, Timothy Moses ("Moses"), his spouse Shelley Steele and their son Chase Moses (collectively, the "Aliera Insiders").[4] Aliera was a for-profit entity with its stated scope of business being "to engage in the business of providing all models of Health Care to the general

---

[4] Before forming Aliera, Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with and convicted of felony securities fraud and perjury. As a result of the criminal case, Moses was sentenced to more than six (6) years in prison and ordered to pay $1.65 million in restitution. Aliera allegedly made transfers to another company owned by Steele, which then made the restitution payment on Moses' behalf.

public" and "to cultivate, generate or otherwise engage in the development of ideas or other businesses."[5]

Aliera began selling healthcare products in late 2015. At the time it was formed, Aliera only sold "direct primary care medical home" ("DPCMH") plans. DPCMH plans generally cover limited services such as some doctors' visits and basic lab services but provide no hospitalization or emergency room coverage. Those plans did not comply with the Affordable Care Act ("ACA") requirements.[6]

The Aliera Insiders realized Aliera could greatly increase the sales of its health care products if it could take advantage of the federal statute that exempted taxpayers who purchased HCSM coverage from the ACA's individual mandate. They also realized that Aliera could avoid insurance laws in many states that also have an exemption from insurance regulations for entities that meet those states' HCSM requirements.

Anabaptist Healthshare ("Anabaptist") was a small Mennonite entity that had been recognized by the U.S. Department of Health & Human Services' Centers for Medicare & Medicaid Services as an HCSM that had met the requirements under 26 U.S.C. § 5000A.[7] In 2016, Moses convinced Anabaptist to permit Aliera to market its

---

[5] Aliera's formation documents do not include any discussion of religious or ethical purposes or missions.

[6] *See* 42 U.S.C. § 18022(b)(1) (describing "essential health benefits" provided for by the ACA); 26 U.S.C. § 5000A(d)(2)(B)(ii) (describing the requirements to qualify as an HCSM).

[7] When Congress passed the ACA in 2010, it required all individuals to be covered by health insurance or pay a penalty. Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A. One of those exceptions was for members of existing HCSMs. In order to qualify as an HCSM under the ACA, an entity must meet the following requirements:

    (1) it must be recognized as a 501(c)(3) tax exempt organization;

plans along with Anabaptist's sharing program using Anabaptist's HCSM designation. Anabaptist created a wholly owned subsidiary, Unity, for this purpose.

On February 1, 2017, Aliera entered into a contract with Unity, pursuant to which Aliera would offer to the public its own health care products that did not meet the insurance benefits and coverage requirements under the ACA[8] and did not independently qualify for the HCSM exemption under 26 U.S.C. § 5000A. In return, Aliera's customers would join the Unity HCSM, thereby increasing the membership in Anabaptist's HCSM. Under the contract with Unity, Aliera: (a) was responsible for maintaining and segregating the assets received that were supposed to be reserved for payment of benefits; (b) directly received Consumer Members' payments for both components of the plan; and (c) unilaterally determined how much of the payment was designated for both the Aliera and Unity components of the plan, and how much of the payment would be used to actually pay Consumer Members' medical expenses.

In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity discovered that Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval and had not properly

---

(2) its members must "share a common set of ethical or religious beliefs and share medical expenses among members according to those beliefs";
(3) its members must "retain membership even after they develop a medical condition";
(4) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999"; and
(5) it must be subject to an annual audit by an independent CPA and make that audit available to the public upon request.
26 U.S.C. § 5000A(d)(2)(B)(ii). The reason for the 1999 cutoff date was to ensure the reliability of care that comes with historical practice and to prevent "opening the flood gate" to groups seeking to circumvent the requirements of the ACA. *Liberty Univ. v. Lew*, 733 F.3d 72, 102 (4th Cir. 2013).
[8]Although this allegation may be true, it is the Court's understanding that HCSM plans are exempt from many of these types of requirements of the ACA.

maintained assets reserved for payment of benefits to the Consumer Members. Unity requested an accounting, demanded Aliera turn over control of all Unity funds, and eventually terminated the relationship with Aliera in the summer of 2018. A lawsuit between Aliera and Anabaptist Health Share/Unity was filed in Superior Court of Fulton County, Georgia in late 2018.

With its relationship with Unity terminating, Aliera would have no affiliation with any HCSM through which to sell its health care plans, so on June 27, 2018, its principals formed Trinity as a purported Delaware nonprofit entity. William Rip Thead, III became the CEO of Trinity. Mr. Thead was an Aliera employee at the time of Trinity's organization before permanently transitioning to Trinity's CEO.

On or about August 13, 2018, Aliera signed an agreement with Trinity, whereby Aliera was allowed to use Trinity's nonprofit status to sell the purported HCSM plans and Trinity granted Aliera control over and interest in the design and marketing of the plans, the Consumer Members' payments, the administration of the purported HCSM plans, the benefits paid, and the membership roster (the "2018 Agreement"). The Trustees allege the 2018 Agreement was drafted to benefit the Aliera Insiders at the expense of Trinity.[9]

The payment scheme under the 2018 Agreement was harmful to Trinity. It provided that all payments made by Consumer Members were to be made directly to

---

[9] Under the 2018 Agreement, Aliera was also authorized to provide accounting staff, financial and membership reporting, and audit and tax filing support. The 2018 Agreement gave Aliera control over enrolling new Consumer Members and provided that Trinity was "not authorized to contact any members or use any information contained in the Membership Roster for any purpose without the prior written consent of Aliera." Additionally, Aliera was granted authority in its sole discretion to "substitute any component of a Plan."

Aliera. To the detriment of Trinity, Aliera would then allocate 30-40% of every payment to pay Aliera's own brokers' commission fees in addition to collecting Aliera's own substantial "administrative fees." After all of Aliera's allocation of funds, only about 16% of the amount paid by Consumer Members would be placed into the Trinity "Sharebox" account for payment of actual medical claims. By contrast, under the ACA, health insurers may not spend more than 20% of premium payments on administrative costs, and 80% must be spent on benefits. 42 U.S.C. § 300gg-18.[10]

## B. Aliera's HCSM Plan Sales, Marketing, and Design Draws Scrutiny from State Regulators

Aliera designed and created the Trinity health care plans to be sold to the Consumer Members as "alternatives" to health insurance that mimicked traditional health insurance plans.[11] The Consumer Members also received a card that mimicked

---

[10] Although HCSM plans are not subject to this requirement of the ACA, the Court interprets this allegation as providing an example of how unreasonable Aliera's so-called "administrative expenses" were.

[11] For example:

    a.    It created "sell sheets" that laid out benefits and costs for various plans. The more robust the plan and the lower the deductible (called a "Member Shared Responsibility Amount" or "MSRA"), the more a member paid. Similarly, the cost of the plans increased as a Consumer Member aged and if the member smoked.

    b.    It advertised the plans as "great for those who simply want to have peace of mind knowing that they will be able to receive the health care services they need when they need them," or as "allow[ing] members to achieve comparable cost assurances for catastrophic health care services (including preventative care and immediate access to doctors through office visits, urgent care, and telemedicine) at a much lower cost..."

    c.    It identified health care expenses, such as in-patient and out-patient care, prescription benefits, preventive care, specialty care and hospitalization, that would be included after the MSRA or a copay was paid.

a health insurance card and were advised to keep it with them at all times to present
to health care providers.

The Trinity health care plans that Aliera created and Defendants sold
prompted increasing complaints from consumers and attracted scrutiny from state
regulators:

  a. As early as April 8, 2019, the State of Washington's Office of the Insurance
     Commissioner issued a final investigative report concluding that Trinity
     was not a valid HCSM and was acting as an unauthorized insurer in
     Washington. As a result, a Cease and Desist Order was entered against
     Trinity and Aliera on May 13, 2019.

  b. On June 13, 2019, the State of Texas filed suit against Aliera alleging it
     was selling unauthorized insurance products in that state and seeking to
     enjoin its sale of those products in Texas.

---

  d. It misrepresented Aliera's practices as similar to those used in health
     insurance by comparing its own jargon with that of a standard insurance
     policy. For example, premium was a "contribution," a deductible was a
     "Member Shared Responsibility Amount (MSRA)," and a co-pay was a "co-
     expense."

  e. Aliera called certain plans "Gold," "Silver," or "Bronze" plans, just as ACA-
     compliant health insurance plans are called.

  f. It created benefits booklets that outlined the benefits of the plan, the exclusion
     from coverage (described as "limits of sharing"), and the necessity of pre-
     authorization for certain medical expenses.

  g. The monthly premium payments that Aliera described as "voluntary
     contributions" were, in fact, mandatory if a member wanted to be eligible for
     coverage of health care costs, just like insurance premiums.

  h. The plans were sold by licensed insurance agents, such as Defendants, who
     were offered outsized commissions for selling the Aliera/Trinity plans.

  i. Like an insurance company, Aliera made payments for covered eligible medical
     expenses directly to medical providers after receiving standard health
     insurance claims. Members never sent payments directly to one another.

  j. The plans promised coverage for an expansive network of "in network"
     providers, and Aliera represented that it was affiliated with "a growing
     nationwide PPO network of more than 1,000,000 health care professionals and
     more than 6,000 facilities."

    c.   Multiple other states followed, including California, Colorado, Connecticut, District of Columbia, Iowa, Maryland, Michigan, New York, New Hampshire, New Jersey, New Mexico, Oregon, and Pennsylvania, all generally concluding that the plans constituted unauthorized insurance.

In addition, several civil lawsuits were filed against Aliera in 2019 and 2020 claiming the health care plans sold through Trinity constituted unauthorized insurance.[12]

## C. Aliera Restructured to Distance Itself from Trinity but Continued to Use Trinity to Prolong the Scheme in Earnest

Despite the numerous regulatory actions and lawsuits, the Aliera Insiders continued to aggressively promote the sale of Trinity plans, including through its network of brokers, such as Defendants.

In June 2019, after the first regulatory actions commenced, the Aliera Insiders realized they needed to re-brand the products. William Guarino, who claimed to be an expert with HCSMs, was recruited and became Trinity's president, its second

---

[12] These lawsuits include *Jackson v. The Aliera Companies, Inc., Aliera Healthcare Inc.*, No. 19-1281 (W.D. Wash. Aug. 14, 2019); *Duncan v. The Aliera Companies, Inc.*, No. 20-00867 (E.D. Cal. Apr. 28, 2020); *Kelly v. The Aliera Companies, Inc.*, No. 20-05038 (W.D. Mo. Apr. 15, 2020); *Smith v. The Aliera Companies, Inc.*, No. 20-02130 (D. Colo. July 20, 2020); *Albina v. The Aliera Companies, Inc.*, No. 20-00496 (E.D. Ky. Dec. 11, 2020).

Aliera claimed in these proceedings that the Trinity HCSM plans were not insurance because neither Aliera nor Trinity had any obligation to indemnify the Consumer Members for medical claims out of their own money, and instead, all medical expenses were to be "shared" from the Consumer Members' funds. Nevertheless, it was Aliera who determined which part of the Consumer Members' payments would be used to pay itself and which part would be placed in a fund to pay the medical expenses, without regard to the amounts needed by Trinity to meet its obligations. Aliera was the claims administrator for the plans. Providers' bills were submitted to Aliera for payment, and Aliera decided whether and when claims would be paid. When the Consumer Members had concerns about claims that were not paid, they called either Defendants or an Aliera representative.

To prolong the scheme, Aliera delayed resolution of the substantive issues in the lawsuits by claiming that an arbitration clause in the back of the Trinity member guides required a multi-step dispute resolution process culminating in binding arbitration in Georgia. After courts found the arbitration clauses unenforceable, Aliera appealed the decisions to further delay substantive judicial scrutiny of its practices.

employee, and third board member. As part of Trinity's re-branding, including amending its certificate of incorporation to change its name to Sharity, it formed an independent board of directors. Among them were Chris Sizemore, who joined the board in November 2019 and became the chairman, as well as Stephen Vault and Joe Handy who joined the board in January 2020 and served as secretary and treasurer of Trinity, respectively. These board members were never associated with and never had any connection to Aliera.

Aliera also created four subsidiary entities (the "Subsidiaries") and changed its name from Aliera Healthcare, Inc. to The Aliera Companies, Inc. in 2019. Aliera divided the various tasks it was performing directly under the 2018 Agreement among its four Subsidiaries. On behalf of Trinity, Mr. Thead signed five agreements with the new Aliera Subsidiaries, all effective January 1, 2020 ("Subsidiary Agreements").

Aliera and its Subsidiaries rebranded the member materials, including sell sheets, member guides, enrollment forms, member cards, web portals, and explanations of benefits, to remove its own name and replace it with the Trinity name or, after Trinity changed its name, the Sharity name. The materials nevertheless were all created by Aliera or one of its Subsidiaries. The administration of all the Consumer Members' claims and handling of the Consumer Members' complaints continued to be by employees of Aliera or one of its Subsidiaries, even though telephone calls and emails would be from accounts nominally in the Trinity/Sharity name. Pursuant to the 2018 Agreement and the Subsidiary Agreements, Aliera was

11

able to set the prices at rates that were substantially less than traditional ACA-compliant health insurance plans in order to make the plans appear attractive to purchasers, while advertising the plans as providing comparable benefits to those health insurance plans.

The Consumer Members' payments continued to go directly to Aliera or one of its Subsidiaries, and the fees continued to be deducted and commissions paid before any of the funds from those payments were deposited into Sharity's Sharebox account for payment of claims. Under these contracts, the Subsidiaries paid themselves 58–60% of the Consumer Members' payments.

### D. Defendants' Alleged Role in the Fraudulent Scheme

Defendants are national insurance brokers that have sold insurance plans for a large variety of insurance companies. Since 2016, Aliera employed a network of sellers, to market the HCSM and DPCMH plans. On or around August 16, 2016, Aliera entered into a call center agreement with Ferguson, on behalf of American Medical, whereby Defendants agreed, without limitation, to provide certain marketing services to prospective customers on behalf of Aliera and solicit enrollment forms and contract applications for certain Aliera/Unity products (the "Call Center Agreement").

Under these Call Center Agreement, Defendants received a 30% commission for each Aliera/Unity plan sold. This rate was significantly greater than commissions for standard health plans and insurance, which typically average between 5% to 10%. By way of example, these high commission payments would have caused Aliera to exceed the medical-loss ratio required under the ACA, to the extent applicable. As an

experienced broker, American Medical, and Ferguson by extension, were familiar with both the industry standard commission and medical-loss ratio. Despite this, Defendants still agreed to sell plans for Aliera at this well-above-market commission rate. In sum, Defendants received commission payments totaling $443,709.44 from their sale of the plans.

Aliera and Defendants marketed and represented that these health care plans were "recognized" as qualified HCSM plans, even though they knew Trinity could not qualify as a legitimate HCSM under 26 U.S.C. § 5000A(d)(2)(B).[13] It was allegedly impossible for Trinity to have been "recognized" as such because the rule that

---

[13] The HCSM plans did not qualify for the following reasons:

   a.   Trinity was created 15 years after December 31, 1999, and at the time of its creation in 2018, had no members. Under the federal statute, an entity or a predecessor of the entity must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(ii)(IV). Trinity did not have members who had shared medical expenses "continuously and without interruption since at least December 31, 1999." Nor did Trinity have any predecessor entity. The application form submitted to the IRS by Aliera's attorney checked "No" to the question, "[a]re you a successor to another organization?"

   b.   In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs...." 26 U.S.C. § 5000A(d)(2)(B)(ii)(III). Although Trinity's original bylaws, attached to its application to the IRS for recognition as a 501(c)(3) entity, set forth a specific set of Protestant Christian religious beliefs, Trinity never restricted its membership to those individuals who affirmed specific common beliefs. Consumer Members were only asked to affirm a generic "Statement of Beliefs" that refers to no particular religion.  As stated in "frequently asked questions" on Trinity's website, "Trinity HealthShare welcomes members of all faiths who can honor the Statement of Beliefs, by which the Trinity HealthShare program operates." As a practical matter, the generic Statement of Beliefs allowed sale of the health care products to the general public.

   c.   Although a CPA firm prepared an independent auditors' report of Trinity's finances for the six months it was in existence in the last half of 2018, it later withdrew that report. Trinity never subsequently completed a financial audit, as required by the statute.

provided this recognition was allegedly eliminated years before Trinity was created and Trinity never appeared on any list of recognized HCSMs developed by the U.S. Department of Health and Human Services.

In addition to allegedly executing the Agreements, the Aliera Insiders worked with the Defendants on how to sell the plans in a manner that would mislead potential customers, including by providing training videos to Defendants.[14] In carrying out its marketing and sales using the materials provided by Aliera, Defendants did not explain to Consumer Members the function or true nature of the plans nor clarify that these plans did not guarantee any actual payment of medical expenses. Although the enrollment forms Aliera created and Defendants provided to Consumer Members asked potential members whether they had any medical issues, Aliera had the policy of not denying membership to anyone who applied. Instead, Defendants would reassure the Consumer Members that despite a preexisting condition, the Consumer Member would still be able to enroll and benefit from the plans.

Defendants provided Aliera's enrollment forms and applications to prospective Consumer Members through electronic mail, United States Postal Service mail, and other means, which specifically stated that "up to 40% of your member contribution goes towards the administration of this plan and other general overhead costs to

---

[14] In one of the training videos, an Aliera employee went through required membership application questions, including questions about religious beliefs that would qualify one for membership in the HCSM, and the presenter states multiple times that "these are not knockout questions" and that despite the applicant's answer, the brokers should still allow them to buy the policy. The presenter also states throughout the video that the agents should be licensed health insurance agents and at one point even refers to the products as insurance before "correcting" himself.

successfully carry out the duties of administering these services." However, up to 84% of the contributions went to administration and other costs, such as commission payments to Defendants and personal payments to the Aliera Insiders.

Despite being aware of Consumer Members' complaints and other scrutiny against Aliera, Defendants continued to market and sell the HCSM plans to consumers. For example, in the fall of 2020, Defendants began selling a new product, Covenant, that was not in the name of Aliera or Sharity, which allowed Defendants to continue to profit from the sale of the HCSM plans while avoiding the "taint" of the Aliera or Sharity branding. Defendants continued their course of conduct in light of the clear signs and "red flags" that the Aliera Insiders were causing Aliera to operate a fraudulent scheme.[15]

As president of Trinity/Sharity, Mr. Guarino attempted to stop the practice of allowing licensed insurance brokers, such as Defendants, to sell the plans on behalf of Trinity/Sharity, but his efforts failed because the relationship between the Aliera Insiders and Defendants was too well established, and Defendants were fully on board to continue with its role in this scheme, despite the growing complaints against Aliera and Trinity.

In general, the Trustees allege that Defendants damaged Aliera and Sharity by working in concert with the Aliera Insiders to knowingly and intentionally: (1)

---

[15] Whether the Aliera Insiders were causing Aliera to technically operate a Ponzi scheme or rather a different type of fraudulent scheme may be an issue down the road. A Ponzi scheme by definition involves a business obtaining money from investors through the promise of a high rate of return on an investment. *In re Pearlman*, 440 B.R. 569 (Bankr. M.D. Fla. 2010). The Consumer Members here were not investors who were promised a high rate of return on an investment but rather were merely paying money into a purported healthcare plan with the expectation their medical expenses would be paid.

15

aggressively market the Aliera/Sharity plans; (2) misrepresent to the Consumer Members that these plans constituted valid HCSM plans; (3) violate various health care laws, consumer protection laws, and telemarketing laws; (4) increase Aliera and Sharity's liabilities through the sale of fraudulent insurance plans; (5) coerce other agents to market and sell the invalid HCSM plans; and (6) accept unreasonably high commission payments that prevented Aliera and Sharity from paying the mounting claims of their creditors. Defendants profited financially from these actions and left Aliera and Sharity with mounting liabilities based on Defendants' sales efforts and few assets to pay those liabilities because the Aliera Insiders were encouraged by Defendants to transfer Aliera's revenues to themselves and Defendants. In addition to increasing the liabilities of Aliera and Sharity and preventing them from being able to pay those liabilities by assisting the Aliera Insiders in misappropriating the debtors' corporate assets, Defendants' sales also increased the debtors' exposure to governmental fines and penalties, as well as legal fees, among other damages.

## II. Sharity and Aliera's Bankruptcy History[16]

### A. *Sharity's Bankruptcy and Aliera's Winddown*

Pursuant to a board resolution approved by William Thead, Chris Sizemore, Joe Handy, Stephen Vault, and William Guarino, Sharity filed for voluntary relief under Chapter 11 on July 8, 2021. By this time, Aliera, with the help of Defendants

---

[16] The Court takes judicial notice of matters of public record in the respective bankruptcy cases for Aliera and Sharity. Docketed items from *In re Sharity Ministries, Inc.*, No. 21-11001 (Bankr. D. Del. July 8, 2021) will be hereinafter cited to by their "Sharity Docket" number. Docketed items from *In re The Aliera Companies, Inc.*, No. 21-11548 (Bankr. D. Del. Dec. 3, 2021) will be hereinafter cited to by their "Aliera Docket" number.

and other brokers, had enrolled almost 100,000 Consumer Members' households[17] in the Sharity health care plans. As of the Sharity bankruptcy petition date, the total amount of the gross unpaid claims was in excess of $250,000,000, but Sharity held only about $743,000 in its Sharebox account for payment of the Consumer Members' medical claims.

After Sharity filed for bankruptcy, it ceased making payments to Aliera and sought to reject its contracts with Aliera. This caused Aliera to cease operations in the first week of October 2021 and, on October 11, 2021, Aliera filed a statutory Assignment for the Benefit of Creditors in Georgia. Through this Assignment, Aliera's assets were transferred to a third party for liquidation and distribution for the benefit of creditors.

Approximately one month later, judgments were entered against Aliera (a) on November 11, 2021, in *Jackson, et al. v. The Aliera Companies, Inc., et al.*, for more than $21,000,000, and (b) on November 17, 2021, in *Albina, et al. v. The Aliera Companies, et al.*, for approximately $4,680,000.

On November 24, 2021, the Sharity Official Committee of Unsecured Creditors filed an adversary proceeding against Aliera, among others, in the Delaware Court for conversion and unjust enrichment, as well as to avoid and recover fraudulent and preferential transfers, seeking damages in the amount of $574,736,117. Complaint, *Off. Comm. of Members of Sharity Ministries, Inc. v. The Aliera Companies, Inc. (In re Sharity Ministries, Inc.)*, Ch. 11 Case No. 21-11001, Adv. No. 21-51291 (Bankr. D.

---

[17] There were 98,892 unique households that purchased Sharity health care plans. A total of 159,307 individuals were enrolled in the plans, including dependents.

Del. Nov. 24, 2021), ECF No. 1 (the "Sharity Adversary"). The Sharity Adversary was stayed when the Aliera Bankruptcy Cases were filed in December 2021.

On November 29, 2021, pursuant to the Plan of Liquidation confirmed by the Delaware Court [Sharity Docket No. 343] in Sharity's bankruptcy case (the "Sharity Plan"), a Liquidating Trust (the "Sharity Trust") was established. [Sharity Docket No. 315]. The Sharity Trust is managed by the Sharity Trustee in accordance with the Liquidating Trust Agreement (the "Sharity Trust Agreement"), and it is overseen by a Liquidating Trust Committee composed of no more than five (5) Consumer Members. [Sharity Docket No. 315-1]. The Sharity Trustee was appointed by the Consumer Members Committee[18] with input from Governmental Units holding Allowed Governmental Fines and Penalty Claims and ratified by the Delaware Court at the confirmation hearing. [Sharity Docket No. 315-1].

Pursuant to the Sharity Plan, all claims and causes of action of both Sharity and its bankruptcy estate vested in the Sharity Trust so that the Sharity Trustee has standing to prosecute those causes of action for the sole benefit of creditors. With respect to the causes of action which are vested in the Sharity Trust, the Sharity Plan and the Sharity Trust Agreement provide that the Sharity Trustee is a fiduciary for the beneficiaries of the Sharity Trust, which are the creditors with allowed claims, thereby excluding Aliera and Sharity itself as beneficiaries. The percentage of the unsecured class of pre-petition Consumer Members and general unsecured creditors that voted in favor of Sharity Plan was 98.16%. [Sharity Docket No. 312]. The total

---

[18] "Consumer Member Committee" here means the Official Committee of Members appointed by the U.S. Trustee in the Sharity Chapter 11 Case on August 20, 2021 [Sharity Docket Nos. 163, 315-1].

claims of those creditors in the Sharity case are estimated to be in excess of $300 million. [Sharity Docket No. 343-1].

### B. Aliera's Bankruptcy

On December 3, 2021, an Involuntary Petition was filed against Aliera in the Delaware Court. This prompted the filing of Aliera's voluntary petitions in this Court on December 21, 2021. Those bankruptcy cases were transferred to the Delaware Court on January 25, 2022, and an Order for Relief was entered on February 16, 2022.

On August 17, 2023, an order entered by the Delaware Court [Aliera Docket No. 576] (the "Confirmation Order") confirmed the *Modified First Amended Plan of Liquidation* (the "Aliera Plan"), which approved the Aliera Trust Agreement and the selection of the Aliera Trustee according to the Aliera Trust Agreement. Pursuant to the Aliera Plan and the Aliera Trust Agreement, all causes of action held by Aliera and its bankruptcy estate were vested in the Aliera Trust, and the Aliera Trustee has "sole and exclusive authority and standing to commence and prosecute" claims of Aliera and its bankruptcy estate for the sole benefit of Aliera's creditors with allowed claims. [Aliera Docket No. 576-1]. With respect to the causes of action that vested in the Aliera Trust, the Aliera Plan and Aliera Trust Agreement provide that the Aliera Trustee is a fiduciary only to the beneficiaries of the Aliera Trust Agreement, which are the creditors with allowed claims, and which excludes the Aliera Insiders and Aliera itself as beneficiaries. [Aliera Docket No. 576]. A committee comprised of no more than two designees from Aliera's Official Committee of Unsecured Creditors and the Sharity Liquidating Trust, respectively, provides oversight of the Aliera

Trustee. [Aliera Docket No. 576]. The percentage of unsecured classes that voted in favor of Aliera Plan was in excess of 93%. [Aliera Docket No. 557-1].

As part of the Aliera Plan, a settlement of the Sharity Adversary was approved, which provided that the Sharity Trustee would have an allowed Class 4 unsecured claim against Aliera of $362,764,161.[19] The Unity Member Claims were also allowed as a Class 4 unsecured claim in the amount of $297,903,437. Other non-insider Class 3 unsecured claims are estimated to be between $10,000,000 to $15,000,000 and Class 5 claims of governmental entities for fines and penalties were estimated at $225,000,000.

## DISCUSSION

### I. Standing and the *In Pari Delicto* Defense

Defendants' Motion places before the Court two oft confused doctrines: standing and *in pari delicto*. Standing is a constitutional limitation on federal-court jurisdiction that requires a plaintiff to "demonstrate [1] that he has suffered 'injury in fact,' [2] that the injury is "fairly traceable" to the actions of the defendant, and [3] that the injury will likely be redressed by a favorable decision." *Bennett v. Spear,* 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). By contrast, *in pari delicto* is an equitable defense that stands for the proposition that "'a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing.'" *See Hays v. Paul, Hastings, Janofsky & Walker LLP*, No. 1:06-CV-754-CAP, 2006 WL 4448809, at *10 (N.D. Ga. Sept. 14,

---

[19] This settlement resolved Sharity Adversary and also resulted in the disallowance of any claims Aliera had asserted against Sharity.

2006) (quoting Black's Law Dictionary 794 (7th ed. 1999)). Importantly, an "[a]nalysis of [a] party's standing does not include analysis of equitable defenses, such as *in pari delicto.*" *Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1149 (11th Cir. 2006).

With this distinction in mind, the Court will address each of these issues in turn, beginning with standing.

### A. Standing

### 1. Rights and Powers Generally of a Trustee or Creditor Representative of a Ponzi-type Debtor

The argument that the Trustees do not have standing to bring the Georgia state law claims asserted here is primarily based on several Eleventh Circuit cases that concluded receivers lacked standing to bring Florida common law tort claims on behalf of a Ponzi corporation because the receivership estate was "'a sham corporation created as the centerpiece of a Ponzi scheme,' [and] the corporate entity could not have suffered any injury from its own fraudulent scheme." *Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1315 (11th Cir. 2024) (emphasis omitted) (quoting *Perlman v. PNC Bank, N.A.*, 38 F.4th 899, 903 (11th Cir. 2022)); *see also Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296 (11th Cir. 2020). Defendants analogize receivers outside of bankruptcy to a liquidating trustee appointed pursuant to a bankruptcy plan and argues that neither the Aliera nor Sharity Trustee has standing because both debtor entities allegedly participated in the fraudulent money-making scheme.

However, with respect to a RICO claim brought under federal law, the Eleventh Circuit affirmed the analysis of the district court that found that a

bankruptcy trustee "had standing based on an alleged injury to the debtor estate" despite the debtor purportedly being an "active participant" in the torts at issue in the case, because a trustee represents the bankruptcy estate and has the right to bring any causes of action that the debtor "could have brought outside of bankruptcy." *Edwards*, 437 F.3d at 1149–50, 1155.

After *Edwards*, the issue of standing in this context does not reappear in a published opinion by the Eleventh Circuit until almost 14 years later in *Isaiah*, 960 F.3d 1296. In *Isaiah*, a receiver of a Ponzi debtor brought two Florida common law tort claims against a bank into which funds were deposited for allegedly willfully ignoring suspicious activity and aiding and abetting the Ponzi scheme. *Id*. The Eleventh Circuit concluded that the receiver did not have standing to bring such claims because the Ponzi torts were imputed to the receiver in situations where the corporation in receivership did not have "at least one honest member of the board of directors or an innocent stockholder," *Id*. at 1306 (citing *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 550 (Fla. Dist. Ct. App. 2003)).[20] *Isaiah* made frequent comparisons of its fact pattern to *Freeman*[21]—a Florida state appellate case interpreting Florida law—and eventually concluded that "[the receiver's] ability to

---

[20] A footnote in *Isaiah* explained that in *O'Halloran v. First Union Nat'l Bank of Fla.*, the Eleventh Circuit "agreed with the trustee that he lacked standing to bring claims against the [third party] related to the Ponzi scheme." *Isaiah*, 960 F.3d at 1306 n.8 (citing *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197 (11th Cir. 2003)). Nevertheless, *O'Halloran*'s dicta, which predates *Edwards,* does not resolve the issue of standing in the case before this Court because it was not actually raised or otherwise litigated in *O'Halloran*, nor did *O'Halloran* deal with the issue of standing of a trustee with respect to Georgia state common law torts claims. Even the concurring opinion in *Wiand* referred to this portion of *O'Halloran* as dicta. *Wiand*, 96 F.4th at 1314.

[21] *See Isaiah*, 960 F.3d at 1307–08 ("This case is indistinguishable from *Freeman*. . . . As in *Freeman*, any claims for aiding and abetting the torts of the Receivership Entities' corporate insiders belong to the investors who suffered losses from this Ponzi scheme, not the Receivership Entities.").

pursue these claims is barred . . . by the fact that the Receivership Entities were controlled exclusively by persons engaging in and benefitting from the Ponzi scheme." *Isaiah*, 960 F.3d at 1306 (citing *Freeman*, 865 So. 2d at 550–51). Therefore, even though the receiver was barred from bringing Florida common law tort claims under the facts of that case, the Eleventh Circuit recognized that these limitations arose under Florida's receivership law.

Two years later in *Perlman v. PNC Bank*, the Eleventh Circuit addressed whether a Florida statute that defined a receiver as having the right and power "to bring actions in the name of and on behalf of the defendant enterprise, without regard to any wrongful acts that were committed by the enterprise" overcame *Isaiah*'s holding on standing. 38 F.4th at 901, 904–05 (quoting Fla. Stat. § 501.207(3)). Interpreting this Florida statute, *Perlman* found that because the statute failed to "address the relationship between a corporation's insiders and the corporation itself," the statute failed to overcome the mandate in *Isaiah* that the plaintiff allege at least one "innocent director or shareholder." *Id.* at 905. Notably, *Perlman* affirmed that *Isaiah* was decided by "[a]pplying Florida law" principles, and the decision suggested that Florida's receivership statutes or cases interpreting them could have changed the outcome in the standing analysis. *See id.* at 905.[22]

Most recently, the Eleventh Circuit decided *Wiand v. ATC Brokers Ltd.*, by applying the principles established in *Isaiah* and *Perlman* to yet another Ponzi entity put into a receivership in Florida. 96 F.4th at 1310–11. While a receiver of a Ponzi

---

[22] "Perlman does not cite to any cases interpreting Section 501.207(3), so we are limited to the plain language of the statute [in effectuating the standing analysis]." *Id.*

entity must allege that there was an innocent director or shareholder, *Wiand* held that these innocent individuals must have had control over the Ponzi corporation sufficient to "exercise[] any decision-making power" over the corporation's affairs in order for that receiver to have standing. *Id*. at 1311.

In his concurring opinion in *Wiand*, the Honorable Stanley Marcus emphasized the state-specific nature of this issue:

> [T]he better way to understand the defect in Wiand's tort claims is the receiver does not have a cause of action under Florida's common law of tort to sue on behalf of Ponzi corporations. *Id* at 1312. … [T]he problem with a receiver bringing common-law tort claims on behalf of a Ponzi corporation in Florida is not that a court lacks the power to adjudicate the claims, but that it chooses not to recognize them. The receiver is without a cause of action precisely because the Florida courts have so ruled, not because the receiver lacks Article III standing, which is a different question the federal courts must answer.

*Id*. at 1316.

Judge Marcus further noted that "courts over the years have used jurisdictional terms in a loose fashion [and] have sometimes mischaracterized claims-processing rules or elements of a cause of action as jurisdictional limitations." *Id*. "The rule in *Isaiah* is the type of mistaken jurisdictional holding the Supreme Court has eschewed." *Id*. at 1314.

In the current case, Defendants downplay Judge Marcus's opinion because it is a concurring opinion. But this concurring opinion is different than most: it is actually joined in by the entire panel, including the author of the majority opinion, Chief Judge William Pryor, the author of *Edwards*, wherein the Eleventh Circuit held that a bankruptcy trustee had standing to sue for injuries to a debtor estate of a Ponzi entity.

What *Isaiah*, *Perlman*, and *Wiand* all share in common is that they not only involve a receiver of a Ponzi debtor asserting Florida common law tort claims, but that the Eleventh Circuit ultimately resolved the standing issue by application of Florida law. The instant case before this Court, however, involves liquidating trustees of liquidating trusts pursuant to 11 U.S.C. § 1123 and claims arising under Georgia law—not Florida law. As the Court will demonstrate, neither the Bankruptcy Code nor Georgia law preclude a trustee from having standing to bring a claim for injury to the debtor even if the debtor was involved in wrongdoing.

To summarize the main point: in addition to actions arising under the Bankruptcy Code, such as avoidance actions, the Trustees have standing to prosecute a claim for an injury the debtor held at the time of the bankruptcy filing under applicable federal or state law. And so, because neither bankruptcy law nor Georgia law prohibit a Ponzi-type debtor from bringing a Georgia state law tort claim based on conduct related to that scheme, and the Eleventh Circuit found the trustee had standing to pursue such a claim in *Edwards*, the Court finds that the Trustees here generally have standing to bring an action based on conduct related to the alleged HCSM scheme. The Court will now address the types of claims the Trustees may prosecute.

### 2.  Determining Whose Claim the Trustees Can Prosecute

Georgia district and bankruptcy courts, as well as the Eleventh Circuit, have found a bankruptcy trustee does not have standing to bring a claim based on harm to the estate's creditors instead of the debtor. *See, e.g., E.F. Hutton & Co., Inc. v. Hadley*,

901 F.2d 979, 985–87 (11th Cir. 1990) (finding that the trustee did not have standing where he "admittedly . . . assert[ed] claims of a *specific group* of [the debtor's] customer creditors." (emphasis added)); *Gordon v. Harman (In re Harman)*, 520 B.R. 906, 909–12 (Bankr. N.D. Ga. 2014) (holding that the trustee did not have standing to bring a claim where the trustee "allege[d] an injury to Debtor's creditors, rather than to Debtor."); *Post-Confirmation Comm. for Small Loans, Inc. v. Martin*, No. 1:13-CV-195-WLS, 2016 WL 632482, at *4 (M.D. Ga. Feb. 17, 2016) (finding that under federal law, there was no standing to pursue claims in which the trustee alleged that "Investors and other creditors of the Debtors were damaged" rather than the debtors themselves being injured. (emphasis omitted)). "The distinguishing element between general and personal claims is whether the type of injury is 'general and common' to debtors and creditors alike or whether the injury is 'peculiar and personal' to the creditor itself. *Post-Confirmation Comm. for Small Loans, Inc.*, 2016 WL 632482, at *4 (citation omitted).

As the Court will discuss in more detail below, the Aliera Trustee's state law claims as alleged in the Amended Complaint are unique to Aliera, are not held by Aliera's creditors, and thus that issue is not of concern to the Court. However, the Sharity Trustee's Georgia RICO claim may implicate the general-personal claim distinction and so will be addressed by this Court.

In *Baillie Lumber Co. v. Thompson (In re Icarus Holding, LLC)*, the Eleventh Circuit held that a bankruptcy trustee may sue a defendant on the basis of the general claims all creditors may have against a third party, as long as the claim is allowed by

state law, as opposed to claims that are particular to a specific creditor. 391 F.3d 1315, 1319–21 (11th Cir. 2004) (holding that in order for an alter ego action to be property of the bankruptcy estate, the "trustee's claim should (1) be a general claim that is common to all creditors and (2) be allowed by state law."). A "claim is a general one when liability extends to all creditors of the corporation without regard to the personal dealings between such officers and such creditors." *Id.* at 1321 (internal quotations and citation omitted). One example of a general claim is where a defendant "loot[ed]' the corporate assets[,] . . . [because] [b]y misappropriating corporate assets, [a defendant] cause[s] direct harm to the corporation and only indirect harm to [the creditors]." *Id.* [23]

---

[23] Property of the estate includes "all legal and equitable interests of the debtor as of the commencement of the bankruptcy case." 11 U.S.C. § 541. *Icarus Holding* stands for the proposition that where a debtor suffers direct harm from the wrongdoing of another party that indirectly harms the debtor's creditors as a whole, the debtor has a general claim that it (or a trustee representing the estate) can pursue against the wrongdoer, provided that state law permits such a claim. *See In re Icarus Holding, LLC*, 391 F.3d at 1319–21.

One case that was argued as applying to the present proceeding was *Flatau v. Stewart (In re Stewart)*, 339 B.R. 524 (M.D. Ga. 2006). In that case, the court held that a RICO claim brought by an individual creditor was not stayed because under the doctrine of *in pari delicto* that claim was not property of the estate. As the Court mentioned above and will discuss below, the doctrines of standing and the *in pari delicto* defense are often confused and, in fact, different concepts that warrant separate analyses. *See Edwards*, 437 F.3d at 1149 ("'[A]n analysis of standing does not include an analysis of the equitable defenses, such as *in pari delicto*.'" (citation omitted)). For this reason, the Court is not persuaded by *Stewart*. In the Eleventh Circuit, regardless of the applicability of the *in pari delicto* defense, a general claim for damages applicable to all creditors is property of the estate for which a debtor or its representative in bankruptcy has standing to bring. *See In re Icarus Holding LLC* 391 F.3d 1319 (holding that an alter ego action may be pursued by a bankruptcy trustee where it is a general claim applicable to all creditors and allowed by state law); *Bond Safeguard Ins. Co. v. Wells Fargo Bank, N.A.*, 502 Fed. Appx. 867, 869 (11th Cir. 2012) ("A general claim that 'applies equally to all creditors' and can be brought by the debtor is the property of the bankruptcy estate of the debtor." (quoting *In re Icarus Holding, LLC*, 391 F.3d at 1319–20)). Thus, whether a claim is property of the estate is applicable in a standing analysis but not an *in pari delicto* analysis, which is an equitable, affirmative defense to a cause of action rather than a defense to whether a particular claim is property of the estate.

This is similar to the Sharity Trustee's Georgia RICO claim before the Court, in which Defendants are alleged to have partaken in a scheme that directly harmed Sharity by participating in a scheme to misappropriate funds that otherwise would have been placed in Sharity's Sharebox account and used to pay Sharity's creditors' claims. The Court finds that the Georgia RICO action brought by the Sharity Trustee is for conduct that directly harmed Sharity by leaving it with inadequate funds to pay its creditors, rather than a claim arising from "unique or personal harm" to a specific creditor, *see id*., which the Eleventh Circuit prohibited trustees from bringing in *E.F. Hutton*. On the flip side, the alleged conduct indirectly harmed Sharity's creditors as a whole by severely limiting Sharity's ability to pay those creditors.

In addition, the Court finds that the mere fact both the debtors and creditors may hold claims against Defendants based on related or overlapping conduct, albeit different causes of action, would not interfere with the policy concerns raised in *Harman*. As the Honorable Joyce Bihary noted in *In re Plaza Mortg. & Fin. Corp.*,

> If the trustee and the creditors have different claims, and if the trustee recovers and makes a distribution to creditors, this does not deprive the creditors of standing to bring their claims. It only reduces their damage claim to the extent they have received a distribution from the estate.

187 B.R. 37, 41 (Bankr. N.D. Ga. 1995)

Thus, if a creditor of Sharity wished to bring claims against Defendants in a separate suit that was not subject to the automatic stay because it was a general claim, they could do so; the only caveat would be that any recovery would be adjusted to prevent them from "double-dipping." *See id.* Judge Bihary's approach makes sense. "The concept of a trustee in bankruptcy is that of a creditor representative whose

single effort will replace that of multiple and often wasteful and competitive efforts of individual creditors." *Id*. at 42. Therefore, "[t]o find that the trustee has no standing to pursue causes of action belonging to the debtor because the recovery would only benefit the creditors is an absurd argument" because at the end of the day, "the trustee's goal is to make a distribution to creditors." *Id*.

When pleading a general claim, whereby the creditors as a whole were harmed, the trustee must still plead an injury unique to the debtor estate as a result of the alleged misconduct. *Id*. at 43–45. For example, such injury could be the misappropriation of funds from the debtor. *Id*. at 43 ("[i]t is the removal of assets that damaged the debtor, and the trustee has standing to sue for this type of injury."). Thus, a "trustee should be careful not to plead a recovery based on any injury to the investors/creditors, even [if] the fraud on the [creditors] will be a part of the background allegations." *Id*. at 44.

The Court now turns to the issue of whether the Trustees have standing for each of the Georgia common law tort and RICO claims in the Amended Complaint before addressing whether the claims are barred by the *in pari delicto* defense and finally whether the Trustees have stated claims upon which relief can be granted.

### 3. The Standing of Our Two Plaintiffs to Bring These Georgia State Law Claims

As discussed, standing is a constitutional requirement that requires a plaintiff to "demonstrate [1] that he has suffered 'injury in fact,' [2] that the injury is 'fairly traceable' to the actions of the defendant, and [3] that the injury will likely be

redressed by a favorable decision." *Bennett*, 520 U.S. at 162 (quoting *Lujan*, 504 U.S. at 560–561).

The first element of standing, injury-in-fact, requires the plaintiff to have suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). Next, that injury must be "fairly traceable" to the defendant's conduct. "Fairly traceable" is a lower causation standard than proximate cause—even "harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

Generally, the following allegations in the Amended Complaint are applicable to all of the claims: Defendants knowingly assisted the Aliera Insiders with the sale of health share plans as part of a scheme to loot corporate assets for their own personal benefit; Defendants were aware of state investigations and consumer complaints regarding the HCSM plans it was selling; Defendants' commission rate for the sale of these plans was so unreasonably high that Defendants knew or should have known that Aliera and Sharity would not have sufficient funds to pay the medical claims of Consumer Members; and the liabilities of Aliera and Sharity increased with each plan sold, far in excess of any assets that Aliera and Sharity had available to pay them after the transfers to Defendants and the Aliera Insiders, in

30

addition to fines, penalties, legal fees, and other damages incurred on account of the sale of the plans.

### a. The Aliera Trustee established standing for its Georgia common law tort claims for civil conspiracy and aiding and abetting breach of fiduciary duty against Defendants

In its Amended Complaint, the Aliera Trustee pleads counts for aiding and abetting breach of fiduciary duty and civil conspiracy, alleging that Defendants assisted the Aliera Insiders in breaching their fiduciary duties to Aliera. The Aliera Trustee has pleaded an injury to Aliera as a result of the conduct related to these claims. The Aliera Trustee has also alleged that Aliera's creditors were owed fiduciary duties by the Aliera Insiders because Aliera was insolvent at the time of the tort. This begs the question: is this cause of action held by Aliera or Aliera's creditors such that the Aliera Trustee has no standing to bring this claim? As the Court will explain, the answer is no.

To determine whether the Aliera Trustee can maintain this cause of action, the Court must apply the test as set forth in *Icarus Holding* to determine whether the action this claim is based on caused general harm to all of Aliera's creditors and whether state law allows it. First, the Court finds that this is a general claim because it is predicated on the alleged misappropriation of corporate assets by the Aliera Insiders with the assistance of Defendants, which resulted in all of Aliera's creditors being harmed equally because it left Aliera unable to pay its debts as they came due. Thus, the general claim element has been established.

Next, the Court must determine whether Aliera could have brought these claims under Georgia law. To bring a claim for aiding and abetting breach of fiduciary

31

duty, the defendant must have, *inter alia*, "acted to procure a breach of *the primary wrongdoer's fiduciary duty to the plaintiff.*" *Insight Tech., Inc. v. FreightCheck, LLC*, 633 S.E.2d 373, 379 (Ga. Ct. App. 2006) (emphasis added). Additionally, an action for civil conspiracy requires proof of the "underlying tort," which in this case is aiding and abetting fiduciary duty. *Jenkins v. Wachovia Bank, Nat. Ass'n*, 711 S.E.2d 80, 85 (Ga. Ct. App. 2011). Here, the Aliera Trustee alleged that Defendant aided and abetted Aliera's Insiders, the purported "primary wrongdoers," in breaching their fiduciary duties owed to both Aliera and Aliera's creditors.

As previously discussed, the Aliera Trustee does not have standing to assert claims held by Aliera's creditors on their behalf, but the Aliera Trustee does plead direct injury to Aliera itself as a basis for its claim, as well. The next question is whether the Aliera Insiders owed a fiduciary duty to Aliera, instead of the creditors, despite Aliera allegedly being insolvent since its inception.

Georgia law "does not authorize [the State] to regulate the organization or internal affairs of a foreign corporation authorized to transact business in" Georgia. O.C.G.A. § 14-2-1505(c). Because Aliera was a Delaware corporation, the Court must look to Delaware law governing the fiduciary duties of corporate directors and officers of an insolvent corporation. Applying Delaware's law for corporate fiduciary duties, "[t]he directors of an insolvent firm . . . owe fiduciary duties [directly] *to the corporation* for the benefit of all of its residual claimants." *Quadrant Structured Prod. Co., Ltd. v. Vertin*, 115 A.3d 535, 546–47 (Del. Ch. 2015) (emphasis added) (explaining the Delaware Supreme Court's decision in *N. Am. Catholic Educ. Programming*

*Found., Inc. v. Gheewalla*, 930 A.2d 92, 101, 103 (Del. 2007), which held that "the creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties," but "have no right to assert direct claims for breach of fiduciary duty against corporate directors.").

So, what does this mean for the case before this Court? Because Georgia law requires the Court to apply the law of Aliera's state of incorporation—Delaware—Aliera's Insiders continued to owe a fiduciary duty to Aliera itself while Aliera was insolvent. Aliera's creditors, by contrast, were never directly owed fiduciary duties by the Aliera Insiders—the primary wrongdoers alleged as part of this claim. Their standing would have been limited to a derivative suit brought on behalf of Aliera. Thus, the Aliera Trustee is the exclusive holder of this claim based on direct harm to Aliera and its estate. As such, the Aliera Trustee has standing to prosecute claims for aiding and abetting breach of fiduciary duty and civil conspiracy.

Based on the foregoing, the Court finds that the Aliera Trustee has sufficiently pleaded an injury to Aliera as a result of Defendants' alleged agreement with the Aliera Insiders to knowingly sell fraudulent HCSM plans with the purpose of looting Aliera's corporate assets for the benefit of Defendant and the Aliera Insiders. The carrying out of this purported agreement suffices to establish an injury in fact to Aliera that is fairly traceable to Defendants' purported assistance with furthering the scheme. Finally, the alleged injury may be redressed by money damages. Therefore,

the Aliera Trustee has standing to pursue its claims for aiding and abetting breach of fiduciary duty and civil conspiracy.

### b. The Sharity Trustee has standing to pursue its Georgia RICO Claim

Next, the Court finds that the Sharity Trustee has standing to assert its Georgia RICO claim against Defendants. As the Court's discussed above, the Sharity Trustee would have standing to assert this claim even if it was considered a general claim because the conduct alleged appears to have directly harmed Sharity by leaving it unable to pay its debts as they came due and indirectly harmed Consumer Members through Sharity's inability to pay their medical expenses. Under the facts asserted in the Amended Complaint taken in the light most favorable to the Sharity Trustee, Defendants allegedly acted in concert with the Aliera Insiders to sell thousands of fraudulent insurance plans in a scheme that rendered Sharity insolvent, that the transfers to Defendants and the Aliera Insiders left Sharity with insufficient funds to pay Consumer Members' claims, the fines and penalties it incurred from the plethora of state regulatory actions, and legal fees it incurred, all of which are traceable to Defendants' aggressive sales of the HCSM plans. These financial injuries may be redressed through monetary damages.

### c. The Aliera Trustee has standing to pursue its fraudulent transfer claims.

Under 11 U.S.C. § 544(b)(1), a trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable [state] law by a creditor holding an [allowable] unsecured claim." Through the operation of § 544, the Aliera Trustee brought avoidance claims in this

case under the Georgia Uniform Voidable Transfer Act ("GUVTA"). *See* (Am. Compl. ¶ 134, ECF No. 7); O.C.G.A. § 18-2-70, *et seq*.[24] Under GUVTA, an "asset" is property of the debtor, but a "transfer" that may be subject to avoidance is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset *or an interest in asset* and includes payment of money." O.C.G.A. §§ 18-2-71(2), (16) (emphasis added).

Defendants argue that the Aliera Trustee does not have standing to pursue its fraudulent transfer claims because it failed to allege that Aliera had an interest in the alleged funds that were the subject of the Transfers. However, the Amended Complaint tells a different story.

The Amended Complaint sufficiently alleged that the Transfers were an interest of Aliera in property. This is plausible based on the allegations of the Amended Complaint, including that the 2018 Agreement provided for the monies paid by Consumer Members to be paid directly to Aliera. Aliera's arrangement with Unity similarly provided that Consumer Members directly paid Aliera. As the Court reads the Amended Complaint, nothing establishes that the payments made by the Consumer Members to Aliera remained property of the Consumer Members. There is

---

[24] The Aliera Trustee argues that *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177 (11th Cir. 1987) governs the issue of whether a debtor had sufficient control over funds such that the funds may be the subject of a fraudulent transfer action. Although *Nordberg* does not deal with 11 U.S.C. § 544 nor GUVTA, but with 11 U.S.C. § 548—a separate fraudulent transfer statute, the statutes are substantially similar for the purposes of this Motion. *Id*. In that case, the Eleventh Circuit held that for purposes of the § 548 fraudulent transfer statute the debtor there sufficiently "had control of funds." *Id*. at 1181. In any case, the Aliera Trustee would have met this burden if it alleged its avoidance claims under § 548. The Amended Complaint alleges that Aliera, in its operations, put money into and took money out of the Sharebox account. These allegations indicate to the Court that Aliera had control over the funds.

no allegation that this was like a bank account or an investment account, where a customer retains control over their assets. But even if Consumer Members' payments were treated in such a manner, this would not be dispositive. In *King v. Kovack Secs. Inc.*, the court found that a debtor investment firm had an interest in its customer accounts despite the accounts being owned by the respective account holders because the debtor managed the funds and had the ability to transfer the funds. 2020 WL 11191805, at *4–5 (N.D. Ga. June 29, 2020) (Jones, J.).

Likewise, Aliera was alleged to have managed—if not outright owned—the monies it received from Consumer Members, who directly paid Aliera for its purported services, and Aliera had the ability to transfer those funds, including to third parties and also into and out of the Sharebox. Similar to Judge Jones' conclusion under the facts in *King,* "it stretches the bounds of reason to argue that" Aliera "ha[d] absolutely no interest in" monies paid to it by Consumer Members for its purported services. *Id.* at *4 (internal quotations and citation omitted).

Accordingly, the Court finds Aliera Trustee has sufficiently pleaded that Aliera had an interest in the funds it allegedly transferred to Defendants for purposes of the Aliera Trustee's fraudulent transfer claims.

### B. *The Equitable Defense of* In Pari Delicto

Defendants' next argument is that even if the Trustees have standing to bring these Georgia state law causes of action, these claims should be barred as a matter of law at this early stage of the proceeding based on the *in pari delicto* defense. The *in pari delicto* defense is an equitable, affirmative defense. Generally, "the existence

36

of an affirmative defense will not support a motion to dismiss" unless the defense appears on the face of the complaint. *Quiller v. Barclays American/Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984).

The term *in pari delicto* means "in equal fault,"[25] and it has been recognized in federal courts as an equitable defense that stands for the proposition that "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Black's Law Dictionary 794 (7th ed. 1999). The Eleventh Circuit applied this doctrine to bar a federal RICO claim under "[t]he federal law of affirmative defenses" in *Edwards*, 437 F.3d at 1152. But because the instant case involves claims arising under Georgia law, this Court must apply Georgia's law of equitable defenses to determine the applicability of this particular defense. *See Cohen v. Morgan Schiff & Co., Inc., (In re Friedman's Inc.) (II)*, 394 B.R. 623, 631 (S.D. Ga. 2008) (applying Georgia law for the *in pari delicto* defense to Georgia tort claims); *see also Am. Pegasus SPC v. Clear Skies Holding Co., LLC*, No. 1:13-CV-03035-ELR, 2015 WL

---

[25] *See Pinter v. Dahl,* 486 U.S. 622, 632 (1988).

10891937, at *23 (N.D. Ga. Sept. 22, 2015) (same); *Hays,* 2006 WL 4448809, at *10 (same).[26]

Georgia law does recognize *in pari delicto* as an equitable defense. *See Bell v. Sasser*, 520 S.E.2d 287, 293 (Ga. Ct. App. 1999). This defense is generally explained by reference to O.C.G.A. § 23-1-15, which provides that "[w]hen both parties are equally at fault, equity will not interfere but will leave them where it finds them." To the extent the Georgia state law claims asserted herein by the Trustees are subject to the defenses Defendants may have had against Aliera and Sharity under Georgia law, Defendants' defenses are also subject to any exceptions and limitations to those defenses imposed by Georgia law. *See In re Friedman's Inc. (II)*, 394 B.R. at 631; *see also Am. Pegasus SPC*, 2015 WL 10891937, at *23; *Hays,* 2006 WL 4448809, at *10.

---

[26] In *Kelley v BMO Harris,* the Eighth Circuit Court of Appeals recently reversed a substantial jury award in favor of bankruptcy trustee against the defendant because the district court determined that the *in pari delicto* defense was unavailable against the trustee. Nos. 23-2551, 23-2632, 2024 WL 4158179 (8th Cir. Sept. 12, 2024). That decision plainly states that it was based on the application of Minnesota state law. "If [the debtor] had sued BMO in a Minnesota court, the defense of *in pari delicto* would have been available." *Id.* at *3. "No Minnesota decision purports to eliminate the defense of *in pari delicto* in a bankruptcy case." *Id.* at *4. The case before this Court is not controlled by Minnesota law, but by Georgia law, so the Court will confine its focus to Georgia law.

*BMO Harris* also discusses what it sees as a distinction between the ability of a receiver appointed by a federal court to recover claims for the benefit of creditors and a bankruptcy trustee, arguing the court appointed receiver has greater authority—or fewer limits—than a bankruptcy trustee to pursue certain types of claims. Whether that is correct or not did not affect this Court's decision. To the extent the distinction is viewed as important, this Court does note that the Trustees here are not bankruptcy trustees appointed pursuant to Sections 701, 702 or 1104 of the Code, but are rather liquidating agents—who could have just as easily been called Receivers or Creditor Representatives—appointed by a federal court to administer liquidation trusts for the sole benefit of creditors pursuant to Section 1123 of the Code. For example, and in addition to the other provisions of the Aliera Trust and Aliera Plan discussed herein, Section 9.1 of the Aliera Plan provides: "The Liquidating Trustee will act for the Creditors in a fiduciary capacity as applicable to a board of directors and shall be responsible for the liquidation of the remaining Assets." Among those assets are causes of action, which are defined in Section 1.15 of the Aliera Plan to mean "any cause of action held by the Debtors, the Estates, the Trust or any of them of any nature or type whatsoever, at law or in equity, against any person or entity."

Defendants argue that the Aliera Trustee's aiding and abetting breach of fiduciary claim and the Sharity Trustee's Georgia RICO claim are barred by the *in pari delicto* defense based on the debtor entities' alleged active participation in the wrongdoing. To demonstrate this, Defendants contend that (1) Aliera nor Sharity had any innocent shareholders with power to stop each debtor's respectively alleged wrongdoing; and (2) Aliera and Sharity perpetrated the alleged wrongdoing.

By contrast, the Trustees argue: (1) it is premature to determine the applicability of the affirmative defense in the context of a motion to dismiss; (2) the allegations in the Amended Complaint show that the *in pari delicto* defense does not bar the Sharity Trustee's claims; and (3) exceptions exist that prohibit the application of the *in pari delicto* defense to the Aliera Trustee's claims.

The Court first turns to the exceptions to the *in pari delicto* defense under Georgia law—the innocent creditor exception and the adverse interest exception—as well as the exception to the adverse interest exception: the sole actor rule.

## 1. The Innocent Creditor Exception

One exception to the equitable defense of *in pari delicto* recognized by Georgia courts is the "innocent creditor exception." Defendants have not addressed this in its Motion (ECF Nos. 8, 11), even though the Trustees cited several recent cases from District Courts in Georgia that have held the *in pari delicto* defense may not apply where the defense would result in harm to innocent creditors. *See, e.g., In re*

*Friedman's Inc. (II)*, 394 B.R. at 631; *Am. Pegasus SPC v. Clear Skies Holding Co., LLC*, 2015 WL 10891937, at *23; *Hays,* 2006 WL 4448809, at *10.[27]

In *Hays*, the court dealt with the question of "whether Georgia courts would bar the Receiver from pursuing [the defendant] for the (ultimate) benefit of defrauded investors" under the doctrine of *in pari delicto*. 2006 WL 4448809, at *10. In that case, a court-appointed receiver for a Ponzi entity sued the defendant law firm for state law professional negligence and breach of fiduciary duty where the defendant allegedly performed legal services that furthered the Ponzi entity's scheme to defraud investors. *Id.* at *2–3. Because the Ponzi entity itself sought the defendant's legal services to further its own fraudulent scheme, the defendant asserted the *in pari delicto* defense against the receiver's claims. *See id.* at *3, *10. The Honorable Charles Pannell found that "it is likely that Georgia courts would not apply the defense of *in pari delicto* under the circumstances of this case," because "Georgia courts have historically exercised their equitable powers to bar the use of equitable defenses where the result would be harm to innocent third parties, such as creditors." *Id.* at *10 (citing *Brooke v. Kennedy*, 158 S.E. 4, 5 (Ga. 1931) (rejecting the defense of *in pari delicto* because "[t]hese claims have come into the hands of the Receiver [appointed for the benefit of creditors] and from which creditors should be paid. It would require

---

[27] *Edwards* was either cited in each of these opinions or discussed in the briefs, so these Courts were well aware of the Eleventh Circuit's decision applying the *in pari delicto* defense to bar *federal* RICO claims brought by the trustee of a Ponzi debtor.

a strong case for a court of equity under such circumstances to refuse creditors protection through a receiver.").[28]

Judge Pannell discussed that the *in pari delicto* defense "'is based on the principle that to give the plaintiff relief would contravene public morals and impair the good of society. Hence, it should not be applied in a case in which to withhold relief would, to a greater extent, offend public morals.'" *Hays*, 2006 WL 4448809, at *10 (quoting *Gaines v. Wolcott*, 167 S.E.2d 366, 370 (Ga. Ct. App. 1969), *aff'd,* 169 S.E.2d 165 (Ga. 1969)). Ultimately, Judge Pannell concluded that Georgia courts "would look to the equities of the situation and refuse to bar relief where the one *in pari delicto,* here [the Ponzi entity's insider], is eliminated from the suit and the recovery would ultimately go to innocent victims." *Id.*

A couple of years after Judge Pannell's decision in *Hays,* the District Court for the Southern District of Georgia also applied the innocent creditor exception to the *in pari delicto* defense in denying a motion to dismiss the Georgia state law claims against another large national firm brought by the liquidating trustee for a liquidating trust approved under a Chapter 11 reorganization plan. *In re Friedman's (II)*, 394 B.R. at 631. In that case, the Honorable B. Avant Edenfield relied on the reasoning in *Hays* and also cited to *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383,

---

[28] S*ee also Roney v Crawford,* 68 S.E. 701, 702 (Ga. 1910) (rejecting the *in pari delicto* defense because "[t]he action by the trustee in bankruptcy is not to recover and pay a prize, but to collect . . . assets of the bankruptcy corporation for the purpose of paying legally chargeable claims against the bankrupt estate. . . . [T]he court will interfere to prevent those who have obtained money under the illegal contract, obtained money belonging to other persons on the representation that the contract was legal, from keeping the money." (citations omitted)). Although *Roney* relies, in part, on an English Chancery Court case, O.C.G.A § 23-1-2 specifically says that Georgia "equity jurisprudence embraces the same matters of jurisdiction and modes of remedy as were allowed and practiced in England."

387 (1944), which held that the equitable defense of *in pari delicto* was "'not a rigid formula.'" *In re Friedman's (II)*, 394 B.R. at 631 (citing *Johnson*, 321 U.S. at 387). Ultimately, he concluded that the "application of *in pari delicto* doctrine in Georgia is a fact intensive inquiry done on a case by case basis." *Id*. at 632.

A similar result was reached by the Honorable Eleanor Ross in the Northern District of Georgia in *Am. Pegasus SPC*, 2015 WL 10891937. In *Am. Pegasus*, the plaintiff was the debtor, albeit acting through Joint Official Liquidators ("JOLs") under the laws of the Cayman Islands. *Id*. at *4. The JOL's, on behalf of the debtor, sued the defendants—former agents of the plaintiff—for civil conspiracy and procuring breach of fiduciary duty over a leveraged buyout transaction. *See id*. at *1– 4. The defendants argued that the *in pari delicto* defense applied against the plaintiff JOLs because the principal's knowledge is imputed to the plaintiff and that the JOLs were similar to the bankruptcy trustee in *Edwards*. *Id*. at *23.

However, Judge Ross found that the application of the *in pari delicto* defense "would yield an absurd result" because its application "would ignore certain realities of the procedural and factual background of this case." *Id.* at *23. "Defendants should not be able to shield themselves by virtue of imputing the knowledge and action of [the principals] to the company" because the company was "acting by and through its JOLs, so that it may recover any assets which were illegally obtained, and then distribute those assets as appropriate [only] amongst AmPeg's innocent creditors." *Id*. She noted that the alleged wrongdoers formerly within the plaintiff entity "would not benefit" if the plaintiff JOLs successfully prosecuted the case—only innocent

creditors. *Id.* In reaching this decision, Judge Ross followed the same line of reasoning as *Hays* and *Friedman's* to apply Georgia's innocent creditor exception to the *in pari delicto* defense. *Id.* (citing *Hays*, 2006 WL 4448809, at *10).

These Georgia District Courts reached these conclusions because the *in pari delicto* defense is an equitable defense that warranted these courts to consider the equities in the context of (a) a receiver, (b) a liquidating trustee of a trust approved as part of a Chapter 11 plan and (c) a debtor with court supervised liquidators attempting to recover assets for the benefit of creditors, as opposed to a situation where one actual wrongdoer was seeking to recover against another wrongdoer.

The Georgia Supreme Court has not only considered the equities of the case in the context of the application of the *in pari delicto* defense and determined that equity should protect innocent creditors, but it has also done so in other contexts involving bankruptcy trustees seeking to collect assets for the benefit of creditors.

The Eleventh Circuit Court of Appeals in *In re Icarus Holding, LLC*, certified the question to the Georgia Supreme Court of whether Georgia law would allow a corporation, through a bankruptcy trustee, to bring an alter ego action against its former principal, instead of the more traditional instance where a third party creditor would bring such a suit against the principal. 391 F.3d 1315.[29] Even Georgia bankruptcy courts were divided over this issue, as well as other courts around the

---

[29] The Georgia Supreme Court quoted from the Third Circuit Court of Appeals about how unusual this situation is: "It may seem strange to allow a corporation to pierce its own veil, since it cannot claim to be either a creditor that was deceived or defrauded by the corporate fiction, or an involuntary tort creditor. . . . Because piercing the corporate veil or alter ego causes of action are based on preventing inequity or unfairness, it is not incompatible with the purposes of the doctrines to allow a debtor corporation to pursue a claim based on this theory." *Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296, 300 (Ga. 2005) (quoting *Phar-Mor, Inc. v Coopers & Lybrand*, 22 F.3d 1228, 1240 n.20 (3rd Cir. 1994)).

country. *See In re Icarus Holding, LLC*, 391 F.3d at 1319, 1322 (discussing and citing to cases to show how courts have been divided on the issue of whether a corporation can bring an alter ego action against its principals).

The Georgia Supreme Court unequivocally held that Georgia's equity principles would permit such an action by a bankruptcy trustee. *Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296, 300 (Ga. 2005). In so ruling, the Georgia Supreme Court found that equity favors effectuating bankruptcy policy, specifically where "federal bankruptcy policy seeks "to protect the debtor's assets, provide temporary relief from creditors, and further equity of distribution among the creditors by forestalling a race to the courthouse." *Id.* (internal quotations and citation omitted). Further, the Georgia Supreme Court found that having a bankruptcy trustee prosecute the general alter ego claim instead of individual creditors would "afford[] equal treatment to all [creditors]" and would not "undercut the general bankruptcy policy of ensuring that all similarly-situated creditors are treated fairly." *Id.* (internal quotations and citation omitted). The Georgia Supreme Court also determined that "the usual requirement of third party benefit for a veil-piercing claim is, in fact, met in the case of an insolvent corporation under federal bankruptcy law [because the claim]. . . . will necessarily benefit third parties by providing more money with which to satisfy unsecured claims." *Id.*

The Georgia Supreme Court's decision in *Baillie Lumber* is further evidence that Georgia's equitable principles favor allowing a trustee or other creditor representative to prosecute an action that would benefit all creditors. If this Court

44

failed to recognize the applicability of the innocent creditor exception based on the current allegations, innocent creditors would be left to their own devices, thus running afoul of the core principles as recognized by the Georgia Supreme Court, including to "further equity of distribution among the creditors by forestalling a race to the courthouse" and "providing more money with which to satisfy unsecured claims." *Id.* (internal quotation and citation omitted). As discussed above, this Court has found that the Trustees are bringing their own claims based on injury unique to the debtor estates, and any recoveries of the Trustees would ultimately be for the sole

benefit of the creditors. As such, Georgia's equity principles would apply the innocent creditor exception to the *in pari delicto* defense.[30]

Based on the allegations in Amended Complaint and matters of public record in *Aliera* and *Sharity*, it appears that the innocent creditor exception under Georgia law would be applicable to any assertion of the *in pari delicto* defense. As with the plaintiffs in the District Court and Georgia Supreme Court cases cited above, the Trustee plaintiffs in this case are pursuing these claims for the damage done to the

---

[30] Because the innocent creditor exception is an exception to an equitable defense in a limited factual situation, it would not be applied to many other affirmative defenses. For example, and without intending to consider the many affirmative defenses that exist, a trustee is certainly subject to legal affirmative defenses such as payment, release, accord and satisfaction, and lack or failure of consideration to prevent a third party from having to pay twice or to pay for something for which it received no benefit. Those legal defenses are and should be enforceable against a trustee because the debtor was not injured by the conduct of the third party. However, the application of the equitable defense of *in pari delicto* against a trustee is different: a third party who has allegedly participated in an injury to the debtor is trying to escape liability to the detriment of innocent creditors by imputing the conduct of the now removed bad actor to a trustee.

As set forth in the cases above, Georgia courts recognize that when the wrongdoer has been removed from the debtor entity and the recovery would go for the sole benefit of innocent creditors, equity should not interfere to prevent relief for the benefit of those innocent third parties. Even though the general rule is that a trustee steps in the shoes of the debtor for purposes of causes of action, it is also axiomatic that a trustee and the debtor are separate legal entities. *See, e.g.*, *United States v. Annamalai*, 939 F.3d 1216, 1231 (11th Cir. 2019) ("A Chapter 11 estate, which is created by the filing of a bankruptcy petition, is separate and distinct from the corporate debtor, which 'continues to exist as a legal entity after the filing of [the] petition, whether under [C]hapter 7 or 11[.]'" (quoting 5 Collier on Bankruptcy ¶ 541.02 (16th ed. 2018)); *In re KiOR, Inc.*, 621 B.R. 313, 329 (Bankr. D. Del. 2020) ("[T]he Liquidating Trustee is not a "successor" to the Debtor under the Bankruptcy Code sections 323 or 1104, but rather is a trustee of a trust created pursuant to Bankruptcy Code section 1123(b)(3). The Liquidating Trustee serves in a limited capacity as defined in the Confirmation Order and the Trust Agreement."); *Cohen v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. (In re County Seat Stores, Inc.)*, 280 B.R. 319, 325–26 (Bankr. S.D.N.Y. 2002) ("[A] bankruptcy trustee charged with a statutory duty and endowed with special statutory powers, is an independent and disinterested entity, separate and distinct from the debtor, as well as the pre-petition company, and as such does not strictly 'stand in the shoes' of the debtor. Nor does he assume the identity of the debtor."); *Rieser v. Baudendistel (In re Buckeye Countrymark, Inc.)*, 251 B.R. 835, 840 (Bankr. S.D. Ohio 2000) ("The trustee is not the same entity as the pre-bankruptcy debtor, but is a new entity with his own rights and duties, subject to the supervision of the bankruptcy court.").

Therefore, the innocent creditor exception recognizes that the legal and factual realities of the situation do not call for equity to intervene to aid another wrongdoer by preventing a recovery for the benefit of innocent creditors.

debtors for the sole benefit of creditors:[31] the beneficiaries of the Liquidation Trusts here only consist of creditors with allowed claims and exclude insiders and the debtors themselves.[32] Therefore, the debtors and their insiders cannot participate in any recovery from the litigation. In fact, for tax purposes, the creditor beneficiaries are treated as the grantors and owners of the respective trusts.[33]

Furthermore, although the Sharity Liquidating Trust is managed by the Sharity Trustee in accordance with the Liquidating Trust Agreement (the "Sharity Trust Agreement"), he is overseen by a Liquidating Trust Committee composed of no more than five (5) Consumer Members. [Sharity Docket No. 315-1]. The Sharity Trustee was appointed by the Consumer Members Committee[34] with input from Governmental Units holding Allowed Governmental Fines and Penalty Claims and ratified by the Bankruptcy Court. The Aliera Trustee is similarly overseen by a

---

[31] *See* [Aliera Docket No. 549] (establishing that Aliera, et al. "grant, release, assign, transfer, convey, and deliver" the property of their respective estates, including causes of action, to Aliera Trustee for the benefit of those debtors' creditors); *see also* [Sharity Docket No. 299] (establishing that Sharity "transfer[red], assign[ed], and deliver[ed] to [Sharity Trustee] all its respective right to and interest in and to" Sharity's causes of action, for the benefit of Sharity's creditors).

[32] *See* [Aliera Docket No. 566] (providing for no distribution for "Insider Claims" and that the Aliera Trustee "shall be responsible for the liquidation of the remaining Assets for the benefit of Creditors . . .); [Sharity Docket No. 343] (providing that "Sharity no longer operates as a going concern. It exists only to wind up its affairs and liquidate its assets for the benefit of its creditors, including its [Consumer] Members," and excess distributions may go to nonprofits "dedicated to serving health care and health coverage needs of uninsured individuals" or to Consumer Members as compensation for tort claims they may have held against Sharity).

[33] [Sharity Docket No. 343] ("For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its Beneficiaries. . . . [T]he Liquidating Trust's Beneficiaries will be treated as the grantors and owners [of the Liquidating Trust]."); [Aliera Docket No. 549-1] ("[T]he Liquidation Trust created hereunder be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 677 of the Internal Revenue Code. . . . The Beneficiaries will be treated as the grantor of the Liquidation Trust created hereunder.").

[34] "Consumer Member Committee" here means the Official Committee of Members appointed by the U.S. Trustee in the Sharity Chapter 11 Case on August 20, 2021." *See* [Sharity Docket Nos. 163, 315].

47

committee comprised of creditors, including two designees of the Sharity Trust and two designees of the Aliera Creditors' Committee. More than 98% of the creditors in *Sharity* voted in favor of the Sharity Plan and more than 92% of the creditors in *Aliera* voted in favor of the Aliera Plan.

As previously discussed, Georgia courts have held that "the doctrine of *in pari delicto* is based on the principle that to give the plaintiff relief would contravene public morals and impair the good of society. Hence it should not be applied in a case in which to withhold relief would, to a greater extent, offend public morals." *In re Friedman's Inc.*, 394 B.R. at 631 (internal quotations and citation omitted); *see also Hays,* 2006 WL 4448809, at *10. At least three District Court judges in Georgia have determined that application of the *in pari delicto* defense under facts similar to those before this Court would, to a greater extent, offend public morals and impair the good of society because innocent creditors would be harmed. Based on the record before this Court at this stage of the proceeding, this Court cannot see how the prosecution of these Georgia state law claims against Defendants by these Trustees who are asserting claims for the sole benefit of innocent creditors would offend public morals and impair the good of society.

Upon consideration of the allegations and matters of public record before it at this time, this Court agrees with (a) Judge Pannell's reasoning that to prevent the Trustees from pursing a recovery for injury to their estates for the sole benefit of innocent creditors based on the *in pari delicto* defense would offend public morals and impair the good of society, and (b) Judge Ross's reasoning that to prevent the Trustees

48

from pursuing a recovery for injury to their estates for the sole benefit of innocent creditors based on the *in pari delicto* defense would yield "an absurd result" under Georgia law.[35]

The innocent creditor exception to the equitable defense of *in pari delicto* in Georgia considers whether the equities of the situation exist to support the public policy basis for the defense. Where the insider wrongdoer has been removed and the recovery will be going exclusively to innocent creditors, the innocent creditor exception prevents the other wrongdoer from escaping liability for its actions at the expense of those innocent creditors.[36] And so, to deny the Trustees the opportunity to pursue a recovery here on the basis of the *in pari delicto* defense at the motion to dismiss stage would not be a proper use of equity. It would certainly seem that the application of such an equitable defense in the face of such an equitable exception should at a minimum be a question of fact, rather than applying the defense as a

---

[35] One such absurd result that could arise from the rigid application of the *in pari delicto* defense would be the idea that a Trustee can recover from a debtor's officers and directors for breach of fiduciary duty but not recover from those who aided and abetted or conspired with those officers and directors in the breach of that very same fiduciary duty. *See Off. Comm. of Unsecured Creditors of The Aliera Companies, Inc. v. Steele (In re The Aliera Companies, Inc.)*, Ch. 11 Case No. 21-11548, Adv. No. 23-50433 (Bankr. D. Del. July 7, 2023) (in which the Official Committee of Unsecured Creditors of Aliera—the predecessor to the Aliera Trustee in that suit—and the Sharity Trustee filed suit against the Aliera Insiders for *inter alia*, breach of fiduciary duty). To permit a trustee to sue for damages against one wrongdoer but prevent him or her from suing the other who aided and abetted the breach is clearly an "absurd" result.

[36] Although it has been argued that the *in pari delicto* defense is appropriate because innocent creditors such as these have their own damages for which they may be able to sue a defendant directly, the damages here may only average about $3,700 per claimant (Sharity allegedly covered approximately 98,000 households and has an allowed claim in the *Aliera* case of $366,000,000). Furthermore, the statute of limitations may have expired or will be expiring soon on these claims in the hands of creditors and, as discussed previously and in *Plaza Mortgage,* to the extent any such claims are asserted against Defendant, the Court can easily take that into account in the award of any damages. Finally, whether the innocent creditors here have their own remedies, impractical and inefficient as they may be, does not negate the fact that the Trustees have alleged injury to the debtor estates for which they have standing to sue, and for which the sole beneficiary of any recovery would be innocent creditors.

"rigid formula," contrary to the Supreme Court's ruling, as noted by Judge Edenfield. *In re Friedman's*, 394 B.R. at 631 (quoting *Johnson*, 321 U.S. at 387).[37]

Even though the Court is denying the Motion with respect to whether the *in pari delicto* defense bars the claims asserted by these Trustees at this stage of the proceeding on account of the applicability of the innocent creditor exception based on the allegations in the Amended Complaint and the public record in these cases, the Court will also address the adverse interest exception and the sole actor rule raised in the briefs.

## 2. The Adverse Interest Exception

The adverse interest exception to the equitable defense of *in pari delicto* under Georgia law "applies, and allows [a trustee] to recover, when the [debtor's] agents have acted entirely adverse to the [debtor.]" *In re Friedman's Inc. (II)*, 394 B.R. at 629. The policy underlying the exception is "when the officer or agent departs from the scope of his duties and acts in such a way that his private interest outweighs his obligation as a corporate representative, the law will not impute his knowledge to the corporation." *Id.* at 632 (quoting *Clarence L. Martin, P.C v. Chatham County Tax Com'r*, 574 S.E.2d 407, 409 (Ga. Ct. App. 2002)). Thus, although generally "the acts and knowledge of a corporation's officers and directors are imputed to the corporation because officers and directors are agents of the corporation," this principle may not

---

[37] As we will see below, Georgia—and other—courts have adopted the adverse interest exception to the equitable defense of *in pari delicto*. The reason the courts created this adverse interest exception is because it was equitable to do so. Courts have also created an exception to the exception, the sole actor rule, for the same reason. Georgia courts have likewise created the innocent creditor exception to the *in pari delicto* defense because it was equitable to do so.

apply for purposes of the *in pari delicto* defense by operation of the adverse interest exception. *See Cohen v. Morgan Schiff & Co., Inc. (In re Friedman's, Inc.) (I)*, 385 B.R. 381, 453 (S.D. Ga. 2008) (citing *Miller v. Lomax*, 596 S.E.2d 232, 240 (2004)), *partially vacated on other grounds*, 394 B.R. 623 (S.D. Ga. 2008).

For the adverse interest exception to apply, the debtor must have received no short- or long-term benefit from the actions taken by the debtor's principals. *See In re Friedman's (II)*, 394 B.R. at 630–31. In *Friedman's (II)*, the trustee alleged that the debtor's directors and defendant law firm facilitated a transaction with a third party to reduce its reported debt by $69 million and gain $50 million in preferred stock from the third party, plus $35 million in subordinated notes from an $85 million investment. *Id.* at 630. The defendant law firm, who was sued for malpractice by the trustee, argued that the debtor received a short-term benefit, "trivial" as it may have been, from the transaction by being able to appear "financially healthy" to the outside world. *Id.* at 629–30. But the trustee countered by arguing that the transaction was adverse to the debtor's interest because the debtor never received any dividends and lost the entire $85 million when the third party went bankrupt a mere two years after the transaction. *Id.* at 630. Ultimately, due to the complexity of the allegations and the need to have evidence before it to properly weigh the equities, Judge Edenfield declined to rule on the *in pari delicto* defense as a matter of law at the motion to dismiss stage. *See id.* at 632–33.

Here, the Amended Complaint contains many allegations that Aliera's business was based on a fraudulent money-making scheme where its health plans

were fraudulently marketed so the Aliera Insiders and their brokers, including Defendants, could personally profit at the expense of Aliera and Sharity. These facts tend to show that Aliera's Insiders "depart[ed] from the scope of [their] duties and act[ed] in such a way that [their] private interest outweigh[ed] [their] obligation as a corporate representative, [such that] the law will not impute [their] knowledge to the corporation." *In re Friedman's (II)*, 394 B.R. at 632. And from the face of the Amended Complaint, the Court cannot infer any short or long-term benefits gained by Aliera or Sharity as a result of this scheme, considering this scheme resulted in Aliera and Sharity going bankrupt. Perhaps Aliera was arguably able to expand its operations, but any expansion of Aliera's operation under the facts of the Amended Complaint allegedly only resulted in further "looting" and misappropriation of Aliera's and Sharity's funds by Defendants and Aliera's Insiders so that neither Aliera nor Sharity could pay their liabilities.

The allegations in the Amended Complaint with respect to the adverse interest exception are sufficient to conclude that the adverse interest exception would apply to preclude dismissal at this juncture based on the *in pari delicto* defense against the Trustees. A fact-intensive inquiry will be essential to ultimately determine whether this exception applies to ward off application of *in pari delicto* against the Trustees. *See In re Friedman's Inc. (II)*, 394 B.R. at 632 ("Thus, application of the *in pari delicto* doctrine," including the adverse interest exception, "is a fact intensive inquiry done on a case by case basis.").

### 3.  The Sole Actor Exception to the Adverse Interest Exception

The sole actor rule is an "exception to an exception": even where a principal acts adversely to the corporate debtor, if that principal was the only one with authority, then the adverse interest exception does not apply, and the claim can be barred under the *in pari delicto* defense. *In re Friedman's (II)*, 394 B.R. at 634. The sole actor exception similarly requires a factual inquiry. *Id.* "The presence of independent board members empowered to stop the fraudulent activity" tends to negate the application of the sole actor rule. *Id.* Generally, the defendant must show that the plaintiff-entity's board is "dominated by self-interested directors" to such a degree where the innocent or independent directors are "not empowered to do anything." *In re Friedman's (II)*, 394 B.R. at 633 (citing *In re Scott Acquisition Corp.*, 364 B.R. 562, 569 (Bankr. D. Del. 2007)).

With respect to the application of this equitable exception to the adverse interest exception to the equitable defense of *in pari delicto,* the parties offer conflicting arguments depending on whether they are addressing Aliera or Sharity. They cannot have it both ways. If Sharity is treated separately and apart from Aliera, as the Trustees advocate, then perhaps the Aliera Trustee could be barred by the sole actor rule if the innocent creditor exception did not apply. On the other hand, Defendants seem to argue that Sharity and Aliera should be treated as the same, which means that Aliera should perhaps have the benefit of Sharity's independent officers and directors so as to defeat the application of the sole actor rule in the event the innocent creditor exception did not apply.

This Court agrees with Judge Edenfield that the sole actor rule's application requires "a factual inquiry into the specific circumstances of this case." *Id.* at 634. Because an intensive factual inquiry is necessary to determine the applicability of the sole actor exception to the adverse interest exception to the equitable defense of *in pari delicto,* denial of the Motion on this issue is appropriate at this stage of the proceeding.

### 4. Whether the Sharity Trustee's Claim is Barred By the In Pari Delicto Defense

The Court will now consider whether it must rule as a matter of law that the cause of action brought by the Sharity Trustee is barred by the *in pari delicto* defense at the motion to dismiss stage of the proceeding.

Defendants argue that the *in pari delicto* defense bars the Sharity Trustee's Georgia RICO claim at this stage of the proceeding as a matter of law because the Amended Complaint shows that Sharity was controlled by Aliera, the implication being that either Sharity and Aliera were one in the same or that the actions of Aliera and the Aliera Insiders should be imputed to Sharity and, therefore, the Sharity Trustee. But the Amended Complaint and the public record in these bankruptcy cases do not support the application of the defense against the Sharity Trustee at this stage of the proceeding.

The allegations in the Amended Complaint and the public record in these cases show the following: (a) Aliera was a for-profit corporation with shareholders; (b) meanwhile, Sharity was a nonprofit corporation with no shareholders, including neither Aliera nor the Aliera Insiders; (c) Sharity and Aliera had separate officers

and Sharity had independent directors with no affiliation with Aliera since at least 2019; (d) Sharity's and Aliera's bankruptcy cases show that they have distinct creditors;[38] (e) Sharity and Aliera filed separate bankruptcy cases, which were administered separately, and resulted in confirmed plans of liquidation with separate liquidation trustees administering their respective assets for the sole benefit of their respective creditors; (f) Sharity commenced an adversary proceeding against Aliera for more than $550,000,000 before Aliera filed for bankruptcy; (g) Aliera asserted claims against Sharity in Sharity's bankruptcy case; (h) pursuant to an order from the Delaware Court confirming the Aliera Plan, the Sharity Adversary against Aliera was settled such that Sharity has an allowed claim against Aliera for $366,000,000 and Aliera dropped its claims against Sharity; (i) a potential defense Aliera would have had against any claim of Sharity would be that the entities were one in the same and that defense was apparently waived or released in the settlement; (j) this settlement and the Sharity and Aliera Plans were subject to creditor and judicial scrutiny and approved by the Delaware Court; and (k) Defendants and Sharity were never a party to any agreement and Sharity was not privy to the Agreements between Defendants and Aliera. Therefore, the Amended Complaint and the public record support the separate existence of the two companies and their respective estates and trusts.

---

[38] Sharity's creditors appear to mostly consist of Consumer Members who signed up for its plans, as well as other unsecured claims and fines and penalties from governmental entities. Aliera's creditors primarily consist of Sharity and the Unity Consumer Members who bought Aliera plans, in addition to $10–15,000,000 of other unsecured creditors, as well as more than $225,000,000 of fines and penalties owed to governmental entities.

So, the question becomes, should the actions of Aliera and the Aliera Insiders be imputed to Sharity as a matter of law at this stage of the proceeding?

Courts look to the law of the state where the cause of action arose when determining imputation issues. *See, e.g.*, *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 83–85, (1994); *In re Friedman's Inc. (II)*, 394 B.R. at 631. Under Georgia law, a company may be held liable for the acts of its employees and agents only to the extent they are done within the scope of their employment and with the intent to benefit the corporation. *See Bryan Ventures, Inc. v. Gainor,* Civ. Action No. 2008CV1524632009, 2009 WL 7479383 (Ga. Super. Ct. Apr. 6, 2009). Aliera and the Aliera Insiders were not employees of Sharity. Perhaps Aliera could have been considered an agent of Sharity under its contract, but the allegations of the Amended Complaint show there was no intent for Aliera to benefit Sharity by its actions. Also, an agent's knowledge or misconduct is not imputed to the company where the agent was acting adversely to the company's interests. *In re Friedman's, Inc. (II)*, 394 B.R. at 632 (citing *Clarence L. Martin, P.C.,* 574 S.E.2d at 409 ("[W]hen [an] officer or agent departs from the scope of his duties and acts in such a way that his private interest outweighs his obligation as a corporate representative, the law will not impute his knowledge to the corporation.")).

Based on the allegations in the Amended Complaint, there is no basis for imputing the Aliera Insiders' actions to Sharity as a matter of law because at no time throughout the existence of Trinity/Sharity did the Aliera Insiders ever act in a manner that benefited Sharity's interest. *See In re Friedman's Inc.*, 394 B.R. at 632.

The Amended Complaint alleges that Sharity was never able to maintain funds or uphold its purpose as a nonprofit organization based on the actions of the Defendants and the Aliera Insiders, despite the efforts of independent officers and directors who tried to end this fraudulent scheme. *See* (Am. Compl. ¶ 68, ECF No. 7). The Aliera Insiders allegedly diverted membership payments and other assets that should have gone to Sharity to the personal benefit of themselves and the brokers who worked with them, including Defendants, and used that money to enrich themselves at Sharity's expense. *See* (Am. Compl. ¶ 50, ECF No. 7) ("[U]p to 84% of the contributions went to administration and other costs, such as commission payments to the Defendants and personal payments to the Insiders."). The Amended Complaint also alleges that there was no corresponding benefit to Sharity—only hundreds of millions of dollars in liabilities, sustained operating losses, insolvency, and mounting litigation from the Consumer Members and state agencies. *See* (Am. Compl. ¶ 69, ECF No. 7) ("By the time Sharity filed its bankruptcy petition on July 8, 2021, Aliera, with the help of the Defendants, had enrolled over 98,000 Members in the Sharity health care plans. Yet, due to the Insiders' and the Defendants' large receipt of member funds[,] Sharity's Sharebox account remained woefully inadequate to pay the Members' medical claims as they came due."). These allegations tend to defeat any imputation of the wrongdoing to Sharity.

Defendants argue that the Sharity Trustee's identification of innocent officers and directors of Sharity is insufficient, because it is based "upon information and belief" and such allegations "must be supported by specific facts to render them

plausible." *Brock v. City of Atlanta, GA*, No. 1:22-CV-604-WMR, 2023 WL 2733202, at *2 (N.D. Ga. Feb. 22, 2023), *appeal dismissed sub nom. Brock v. City of Atlanta Fire-Rescue Dep't,* No. 23-10975-DD, 2024 WL 1251341 (11th Cir. Feb. 1, 2024).

The Court finds that the Sharity Trustee has met its burden here. First, the Sharity Trustee contends Mr. Guarino, an allegedly innocent director, was recruited around the same time as the other alleged independent directors and officers. The Trustees have also alleged that Sharity was not a subsidiary or related entity of Aliera and that the Aliera Insiders were not directors or officers of Sharity, but instead were simply the beneficiaries of the 2018 Agreement and the Subsidiary Agreements. *See* (Am. Compl. ¶¶ 29–31, 63–65, ECF No. 7). Moreover, these allegedly innocent persons also comprised four of the five directors who approved Sharity's Chapter 11 petition.[39] While Mr. Guarino was recruited by Chase, Moses, and Mr. Thead, he was hired based on his knowledge of HCSMs, not based on his relationship to Aliera or the Aliera Insiders. Further, Mr. Guarino allegedly did attempt to stop the relationship between Aliera and Defendants and other insurance brokers, thereby demonstrating the acts of an innocent officer.[40]

As such, to the extent the *in pari delicto* defense is even applicable to the claims brought against Defendants by the Sharity Trustee, the Sharity Trustee alleged the existence of innocent persons at Sharity, including William Guarino, Chris Sizemore,

---

[39] *See* [Sharity Docket No. 1] (showing that the board resolution for bankruptcy was approved by Chris Sizemore, Stephen Vault, Joe Handy, William Guarino, and William Thead).
[40] The Amended Complaint alleges that although Mr. Guarino failed to stop the scheme, this was not because he was not a person in control of Sharity, as Defendant seems to suggest, but because he was fighting an up-hill battle, trying to end a scheme that had been on-going for at least three years prior to his arrival.

Stephen Vault, and Joe Handy, who acted as the company's president, treasurer, secretary, and VP of operations, respectively, who could have taken the steps necessary to stop the underlying wrongdoing if they had proper knowledge of that wrongdoing. *See* (Am. Compl. ¶ 61, ECF No. 7). Accordingly, the Amended Complaint alleges that independent officers and directors of Sharity existed with the authority to control Sharity but from whom Defendants and the Aliera Insiders hid the wrongdoing surrounding the scheme to sell fraudulent insurance.[41] *See* (Am. Compl. ¶¶ 55–57, 60–61, 68, 79–80, ECF No. 7). These allegations are sufficient to defeat imputation at the pleading phase. *See Furr v. JPMorgan Chase Bank, N.A. (In re Rollaguard Sec., LLC)*, 570 B.R. 859, 883–84 (Bankr. S.D. Fla. 2017); *In re Refco Sec. Litig.*, 779 F. Supp. 2d 372, 375–77 (S.D.N.Y. 2011); *In re Allou Distributors, Inc.*, 387 B.R. 365, 392–93 (Bankr. E.D.N.Y. 2008).

Based on the foregoing, the Amended Complaint adequately pleads the inapplicability of the sole actor exception as to the Sharity Trustee's claim at this stage of the proceeding.

Furthermore, for the reasons set forth above, the allegations in the Amended Complaint and matters of public record also show the applicability of the innocent creditor exception to the equitable defense of *in pari delicto* with respect to the Georgia state law RICO claim brought by the Sharity Trustee against Defendants at this stage of the proceedings.

---

[41] There are no allegations in the Amended Complaint to support a conclusion that these officers were privy to the conversations between Chase, Moses, and Mr. Thead or between Aliera and Defendant.

All of this is to say that the doctrine of *in pari delicto* is an equitable, affirmative defense dependent upon a fact-intensive inquiry and, as such, is not appropriate for determination on a motion to dismiss based on the allegations in the Amended Complaint and public record. *See Post-Confirmation Comm. for Small Loans, Inc. v. Innovate Loan Servicing Corp.*, No. 1:13-CV-191-WLS, 2015 WL 5769229, at *12 (M.D. Ga. Sep. 30, 2015) (citing *In re Friedman's Inc. (II)*, 394 B.R. at 632); *Welt v. EfloorTrade, LLC (In re Phoenix Diversified Inv. Corp.)*, 439 B.R. 231, 240 (Bankr. S.D. Fla. 2010) ("The affirmative defense of *in pari delicto* typically requires proof of facts asserted by the defendant and, as such, is seldom an appropriate ground for granting a motion to dismiss.").

Therefore, based on the allegations in the Amended Complaint and the public record, there is insufficient basis to rule as a matter of law that Sharity or the Sharity Trustee were *in pari delicto*—in equal fault—at this stage of the proceeding so the Motion for that basis cannot be granted. Although the Court concludes that the *in pari delicto* defense shall not bar the Trustees' claims at this stage of the proceedings, Defendants may still assert this affirmative defense against Trustees**,** including in its answer and future dispositive pleadings.

## II. Whether the Trustees Stated Claims for Which Relief May Be Granted

### A. *Aiding and Abetting Breach of Fiduciary Duty*

Defendants next argue that the Aliera Trustee failed to state a claim for aiding and abetting breach of fiduciary duty under Count VI of the Amended Complaint. The Court disagrees.

To state a claim for aiding and abetting a breach of fiduciary duty under Georgia law, a plaintiff must allege:

> (1) through improper action or wrongful conduct . . . , the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff;
> (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure;
> (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and
> (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Insight Tech., Inc.*, 633 S.E.2d at 379 (footnotes omitted). For this claim to stand, there must have been an underlying breach of fiduciary duty between the "primary wrongdoer" and the plaintiff. *Id.*; *see also TMX Fin., LLC*, 833 S.E.2d 317, 336 (Ga. Ct. App. 2019).

First, the Court must apply Delaware law, by and through Georgia's internal affairs doctrine, to determine if the Aliera Trustee has sufficiently alleged an underlying breach of fiduciary duty by Aliera's directors and officers. O.C.G.A. § 14-

2-1505(c).[42] To state a claim for breach of fiduciary duty, a plaintiff must allege "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010). Corporate directors and officers owe fiduciary duties of loyalty, due care, and good faith to the corporation. *See Gantler v. Stephens*, 965 A.2d 695, 708 (Del. 2009); *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001). The duty of good faith may be breached by either "subjective bad faith," "gross negligence . . . without any malevolent intent," or "a conscious disregard for one's responsibilities." *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 64–66 (Del. 2006). Meanwhile a director or officer violates the duty of loyalty when he fails to maintain "an undivided and unselfish loyalty to the corporation" such that his actions create a "conflict between [his] duty

---

[42] *See Diedrich v. Miller & Meier & Assocs., Architects & Planners, Inc.*, 334 S.E.2d 308, 310 (Ga. 1985), (holding that "the wrongful appropriation of a business opportunity of a foreign corporation by its officer or director is an internal affair not to be regulated by Georgia law" because "the internal affairs doctrine [applies] 'whenever the issue concerns the relations inter se of the corporation, its shareholders, directors, officers or agents.' Restatement (Second) Conflicts of Laws § 313."). In *In re Friedman's (I)*, Judge Edenfield found that the "internal affairs doctrine as applied by Georgia courts requires that the law of the state of incorporation [i.e., Delaware] apply to the claims before this Court alleging breach of fiduciary duties by [the debtor's insiders]," 385 B.R. at 432–33. Later in the same order, the court applied Georgia law to a claim for aiding and abetting the aforementioned breach of fiduciary duty. *Id.* at 438–39. However, in assessing the aiding and abetting claim, Judge Edenfield remained steadfast that the actual fiduciary duties and breach thereof were still governed by Delaware law pursuant to Georgia's internal affairs doctrine. *See id.* at 438–39 ("Because the third element [of the Georgia aiding and abetting breach of fiduciary duty claim] requires an actual breach of fiduciary duty by the primary wrongdoer, the Court only need consider the aiding and abetting claim with respect to the breach of loyalty claims that were sufficiently pled [under Delaware law]."); *see also Kennedy v. Stein*, No. 5:21-CV-00106-TES, 2021 WL 4509167 at *7 (M.D. Ga. Oct. 1, 2021) ("Under Georgia law, breach of fiduciary duty claims fall within the internal affairs doctrine and are thus governed by the state of incorporation.").

To summarize, the aiding and abetting claim is still wholly governed by Georgia law; Georgia law just adopts the law of the state of incorporation through the internal affairs doctrine to determine whether the corporation's officers and directors breached a fiduciary duty to the corporation. So, for our purposes, Georgia law determines the elements of the aiding and abetting breach of fiduciary duty claim, but Delaware law determines whether the underlying breach took place.

and self-interest." *United Food & Commer. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1050 (Del. 2021) (internal quotations and citation omitted). As discussed above, these duties to the corporation persist even when the corporation is insolvent. *N. Am. Cath. Educ. Programming Found., Inc.*, 930 A.2d 92.

Here, the Aliera Trustee sufficiently alleged that Aliera's directors and officers owed fiduciary duties to Aliera by the nature of their positions within the corporation. Next, the Aliera Trustee has met its burden of alleging a breach of the fiduciary duties of good faith and loyalty by pleading that the Aliera Insiders took more than half of all of Aliera's funds for themselves, leaving the company insolvent. The Aliera Trustee pointed to deliberate actions by Aliera's Insiders to create a fraudulent HCSM scheme whereby the Aliera Insiders allegedly looted the company for their own personal benefit and that of Defendants. Additionally, the Aliera Trustee has sufficiently alleged that Aliera's Insiders breached their duties to Aliera through their mishandling of Aliera's assets and misrepresentations about the HSCM plans. Aliera's Insiders allegedly knowingly undertook a fraudulent course of conduct by which they personally derived a financial benefit at the expense of Aliera, causing it to incur liabilities and other expenses it could not pay. The pleadings show that rather than act in the best interest of Aliera, these insiders acted in subjective bad faith towards the company and put their own self-interest above all else. Finding that the allegations sufficiently establish an underlying breach of fiduciary duty, the Court now turns to whether the Amended Complaint sufficiently shows how Defendants' actions allegedly aided and abetted that breach of fiduciary duty.

63

Turning back to Georgia law to determine whether the Aliera Trustee has adequately alleged that Defendants aided and abetted that breach, the Court first looks to whether Defendants had knowledge of the Aliera Insiders' fiduciary duties. The Court finds that based on the allegations in the Amended Complaint, it is plausible that Defendants were an experienced insurance broker and brokerage, routinely worked with companies and their officers and therefore knew that Aliera's Insiders owed a fiduciary duty to Aliera because of their positions within the corporation.

Next, the Court turns to the procurement element. A defendant can procure a breach of fiduciary duty by either "lend[ing] assistance in the actual perpetration of the wrong done by another" or by successfully causing such breach "through advice, counsel, persuasion, or command." *TMX Fin., LLC*, 833 S.E.2d at 336 (internal quotations and citation omitted).[43] Based on the allegations, Defendants "len[ded] assistance in the actual perpetration of a wrong done by [Aliera's Insiders]" by knowingly selling the unlawful HCSM plans at a commission rate that was approximately three times as high as the industry average. *See TMX Fin., LLC*, 833

---

[43] Georgia courts have established that "the word 'procure' . . . does not require the lending of assistance in the actual perpetration of the wrong done by another," but it may also be established by showing that the defendant "acting only through advice, counsel, persuasion, or command, succeeds in procuring any person to commit an actionable wrong." *Insight Tech., Inc.*, 633 S.E.2d at 379 n.12; *see also TMX Fin., LLC*, 833 S.E.2d at 336 ("*Even where* the defendant does not lend assistance in the actual perpetration of the wrong done by another, he procures a breach of fiduciary duty where he succeeds in causing another person to breach his fiduciary duty through advice, counsel, persuasion, or command." (emphasis added) (internal quotations and citation omitted)). Despite Defendants' argument to the contrary, it is clear from these cases that allegations that a defendant "act[ed] only through advice, counsel, persuasion, or command" to successfully procure a breach is merely the bare minimum threshold for establishing procurement, whereas a defendant "lend[ing] assistance" to the actual breach is *more* than is required to establish procurement by the defendant. *See, e.g., Insight Tech., Inc.*, 633 S.E.2d at 379 n.12; *TMX Fin., LLC*, 833 S.E.2d at 336.

S.E.2d at 336. Defendants also knew that Aliera was subject to public scrutiny and large numbers of Consumer Members' complaints. Accordingly, the procurement prongs of the aiding and abetting breach of fiduciary duty cause of action have been sufficiently pleaded by the Aliera Trustee.

Now, the Court looks to the second element of the claim. An act is "malicious when the thing done is with the knowledge of plaintiff's rights, and with the intent to interfere therewith." *Insight Tech., Inc.*, 633 S.E.2d at 379 n.13.[44] To act with malice or with an intent to injure includes "any unauthorized interference, or any interference without legal justification or excuse. Personal ill will or animosity is not essential." *Id.*

From this Court's reading of the Amended Complaint, Defendants, allegedly experienced licensed insurance brokers, would have been familiar with the ACA's 80–20 rule and would have known that the industry standard for healthcare broker commissions is between 5–10%. Defendants' commission on Aliera HCSM plans,

---

[44] Among the damages sought by the Trustees are punitive damages, which Defendant argues the Trustees are not entitled to. In Georgia, "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). "Punitive damages cannot be imposed without a finding of some form of culpable conduct." *Colonial Pipeline Co. v. Brown*, 365 S.E.2d 827, 830 (Ga. 1988). Additionally,

> [W]anton conduct is that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent. Conscious indifference to consequences involves an intentional disregard of the rights of another, knowingly or willfully disregarding those rights.

*Wardlaw v. Ivey*, 676 S.E.2d 858, 861 (Ga. Ct. App. 2009).

As the Court discusses in Discussion Section II.B–D, the allegations show that Defendant knew that the Aliera Insiders were operating a fraudulent scheme and therefore the Court can plausibly infer that Defendant engaged in willful misconduct, malice, wantonness, or an entire want of care towards Aliera and Sharity, which would raise the presumption of a conscious indifference to consequences.

while not technically illegal under the ACA's HCSM rules—or the lack thereof—was allegedly at least two times higher than the industry standard commission for health insurance plans. Moreover, Defendants had an understanding with Aliera's Insiders that their relationship was premised upon the Defendants and Aliera's Insiders taking funds from Aliera that should have been allocated to pay Aliera's liabilities, including the Consumer Members' benefits. This was further shown by Defendants selling the Covenant product which was designed to allow Defendants to continue to sell Aliera products while disguising Aliera's involvement after Aliera became subject to public scrutiny.

Thus, the Court can plausibly infer that Defendants intentionally interfered with Aliera's right to properly carry on its business by having enough money on hand to pay Consumer Members' claims based on its industry experience, outsized commissions, the inquiries it received from regulatory agencies, and the fact that Defendants allegedly agreed with the Aliera Insiders to loot Aliera for their own personal benefit. As such, the Court concludes that the Aliera Trustee sufficiently pleaded that Defendants "acted purposely and with malice and the intent to injure" Aliera. *See Insight Tech., Inc.*, 633 S.E.2d at 379.

And finally, because Defendants' conduct prevented Aliera from having enough money to pay its liabilities, created further claims against Aliera for each sale of an unlawful plan and caused Aliera to have to defend regulatory actions and lawsuits, the Aliera Trustee sufficiently pleaded the damage element of this claim.

Accordingly, for the aforementioned reasons, the Court finds that the Aliera Trustee has stated a claim for aiding and abetting breach of fiduciary duty against Defendants. As such, Defendants' motion to dismiss this claim is denied.[45]

## B. Civil Conspiracy

Defendants next contend the Court should dismiss Count VII of the Amended Complaint for failure to state a claim of civil conspiracy. Under Georgia law, "[t]o recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort." *Jenkins v. Wachovia Bank, Nat. Ass'n*, 711 S.E.2d at 85. In alleging a conspiracy claim, the plaintiff must show that the alleged conspirators had either an implicit or explicit meeting of the minds to carry out the tortious conduct as co-conspirators. *McIntee v. Deramus*, 722 S.E.2d 377, 379 (Ga. Ct. App. 2012); *Parrish v. Jackson W. Jones, P.C.*, 629 S.E.2d 468, 472 (Ga. Ct. App. 2006).

First, because the Aliera Trustee's civil conspiracy claim is based on a conspiracy to commit aiding and abetting breach of fiduciary duty, the underlying tort has been sufficiently pleaded for the reasons mentioned above. Next, despite Defendants' argument to the contrary, the Court finds that the Aliera Trustee has sufficiently alleged a meeting of the minds between Aliera's Insiders and Defendants

---

[45] The Court notes that even if Delaware law governed the *entirety* of the aiding and abetting claim, the result would not change. The elements for aiding and abetting breach of fiduciary duty in Delaware are "(1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary." *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1125 (Del. Ch. 2008). As the Court determined above, the Amended Complaint sufficiently alleges that the Aliera's directors and officers owed fiduciary duties to Aliera, that those duties were breached, and that Aliera was damaged as a result of Defendants' knowing participation in the Aliera Insiders' breach of their fiduciary duties.

to aid and abet Aliera's Insiders' breach of fiduciary duty. As discussed above, Defendants were alleged to be experienced insurance brokers who knowingly accepted unreasonably high commissions as part of a scheme between the Aliera Insiders and Defendants to strip Aliera of its cash and leave Aliera with an inability to pay its expenses. The Court can plausibly infer from these facts that Defendants had a meeting of the minds with Aliera's Insiders to sell unlawful HCSM plans, knowing that those plans were unlawful, and carried out that unlawful design for the personal benefit of Defendants and Aliera's Insiders at the expense of Aliera.

Accordingly, the Aliera Trustee has stated a claim for civil conspiracy by adequately pleading a meeting of the minds, an underlying tort, and actions undertaken by Aliera's Insiders and Defendants to carry out the unlawful design. Therefore, Defendants' motion to dismiss the Aliera Trustee's civil conspiracy claim is denied.

### C. Georgia RICO

Finally, the Court will address Defendants' argument that the Sharity Trustee failed to state a claim for Georgia RICO in Count IX of the Amended Complaint. Despite being a criminal statute, the Georgia RICO Act is also available as a civil remedy. *See Benevolent Lodge No. 3 v. Davis*, 878 S.E.2d 760, 764 (Ga. Ct. App. 2022). Under the Georgia RICO Act, it is "unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." O.C.G.A. § 16-14-4(b).[46] "To establish a

---

[46] While not defined in the statute itself, a "a corporation is a 'person' for purposes of the Georgia civil RICO Act." *Williams Gen. Corp. v. Stone*, 632 S.E.2d 376, 377 (Ga. 2006).

valid civil RICO claim, a plaintiff must [1] 'show that the defendant violated or conspired to violate Georgia's RICO Act and [2] that the RICO violation proximately caused injury to the plaintiff.'" *Benevolent Lodge No. 3*, 878 S.E.2d at 764 (quoting *Five Star Athlete Mgmt., Inc. v. Davis*, 845 S.E.2d 754, 758 (Ga. Ct. App. 2020)).

Because the Sharity Trustee's Georgia RICO allegations allege fraud as the underlying predicate acts, the Court shall review this count under the heightened pleading standard required by Fed. R. Civ. P. 9(b). *See Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (applying Rule 9(b)'s heightened pleading standard to a federal RICO claim because it was based on a predicate act of wire fraud).[47]

In sum, to state a claim under Georgia RICO, a plaintiff must plead with sufficient particularity that the defendant: (1) was employed by or associated with an enterprise; (2) conducted or participated in multiple predicate acts, including federal wire fraud, in furtherance of the enterprise; and (3) the RICO violation proximately caused the defendant's injury. The Court addresses each of these elements in turn.

### 1. Enterprise

First, the Georgia RICO Act defines an "[e]nterprise" as

[A]ny person, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity;

---

[47] Rule 9(b), which is applicable in adversary proceedings through Fed. R. Bankr. P. 7009, applies to the instant case because the rule requires the Amended Complaint to "state with particularity the circumstances constituting fraud." The purpose of Rule 9(b) is to inform "defendants [of] the 'precise misconduct with which they are charged' and protect defendants 'against spurious charges of immoral and fraudulent behavior.'" *Durham*, 847 F.2d at 1511 (citation omitted). However, the application of Rule 9(b) does not completely override the "concept of notice pleading." *Durham*, 847 F.2d at 1511. "Allegations of date, time or place satisfy the Rule 9(b) requirement" for alleging the circumstances of fraud with particularity, although "alternative means are also available to satisfy the rule." *Id.* at 1512.

or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental as well as other entities.

O.C.G.A. § 16-14-3(3).

Here, the Sharity Trustee alleges that Defendants were members of an enterprise with Aliera's Insiders and the other insurance brokers employed by Aliera. (Am. Compl. ¶ 161, ECF No. 7). Because the Sharity Trustee has alleged that Defendants, among other brokers, participated with the Aliera Insiders to sell the HCSM plans, the Court finds that an enterprise association of entities has been plausibly pleaded by the Sharity Trustee.

## 2. Conduct or Participation in a Pattern of Racketeering Activity

To be liable for Georgia RICO, the defendant must have "conduct[ed] or participate[d] in, directly or indirectly, [the alleged] enterprise through a pattern of racketeering activity." O.C.G.A. § 16-14-4(b). A "racketeering activity," also known as a "predicate act," is the commission of, the attempt to commit, or the solicitation or coercing of another to commit a "crime which is chargeable by indictment" under one of forty-one categories of offenses. O.C.G.A. § 16-14-3(9)(A)(i)–(xli); *see also Wylie v. Denton*, 746 S.E.2d 689, 694 (Ga. Ct. App. 2013) (same), Further, a "pattern of racketeering activity" is defined as

> [e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents.

O.C.G.A. § 16-14-3(4)(A). The "pattern" may be established by showing that the same predicate offense was committed at least twice. *See Benevolent Lodge No. 3*, 878

S.E.2d at 765; *see also Ali v. State*, 761 S.E.2d 601, 605 (Ga. Ct. App. 2014) (finding a pattern of racketeering activity where the defendants "committed the [same underlying] predicate offenses—trafficking in contraband cigarettes—multiple times.").

The two predicate acts that the Sharity Trustee alleges Defendants committed are federal mail and wire fraud, as well as violations of Georgia's insurance fraud statute. *See* (Am. Compl. ¶ 169, ECF No. 7); O.C.G.A. § 16-14-3(5)(C), 33-1-9; 18 U.S.C. § 1961(1).[48] A defendant commits wire fraud when he:

> devise[s] or intend[s] to devise any scheme or artifice to defraud, or for obtaining money . . . by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate . . . commerce, any . . . writings . . . [or] sounds for the purpose of executing such scheme or artifice.

18 U.S.C. § 1343.

The elements of mail fraud are identical, except that mail fraud involves use of mail instead of wires. *See* 18 U.S.C. § 1341. In other words, the "elements of mail and wire fraud are: (1) intentional participation in a scheme to defraud, and (2) the use of the interstate mails or wires in furtherance of that scheme." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (citing *United States v. Hasson,* 333 F.3d 1264, 1270 and n.7 (11th Cir. 2003); *United States v. Ellington,* 348 F.3d 984, 990 (11th Cir. 2003)). The use of "wires" may be made through a phone call or the

---

[48] Defendant could not have been liable for RICO based on the predicate act of insurance fraud because that must be committed by a "natural person." *See* O.C.G.A. § 33-1-9; *see also* O.C.G.A. § 33-1-2 (defining "[n]atural person" as being "an individual human being" and not an entity). Still, the Court must analyze the Sharity Trustee's allegations that Defendant committed a pattern of mail and wire fraud activities in violation of the Georgia RICO Act.

internet. *See, e.g., United States v. Patterson*, 534 F.2d 1113, 1114 (5th Cir. 1976) (stating that a phone call suffices as a wire communication for purposes of RICO claims); *United States v. Roemmele*, No. 0:04-CR-60206-JIC, 2011 WL 4625357, at *4 (S.D. Fla. Aug. 3, 2021) (citing multiple cases to show that "courts have long recognized that the wire fraud statute governs fraud committed via the internet"), *adopted by* No. 0:04-CR-60206-JIC, 2011 WL 4625348 (S.D. Fla. Oct. 3, 2011).

The Sharity Trustee alleges that Defendants committed wire fraud by marketing the fraudulent HCSM plans to Consumer Members over the phone, websites, and email. These HCSM plans were allegedly fraudulent because Sharity was not legally qualified to be an HCSM. Defendants also allegedly told potential members that only up to 40% of their contributions would go towards administrative expenses despite more than 80% being allocated to that expense, with 30% being for its commissions alone. Between this example, the emails regarding Covenant attached in Exhibit A, the summary of Defendants' commission payment transfers in Exhibits B, and the well-pleaded factual allegations discussed above, Defendants had sufficient notice of "the precise misconduct with which they are charged." *See Durham*, 847 F.2d at 1511–12 (internal quotations and citation omitted).

Based on the foregoing, the Court finds that the Sharity Trustee has pleaded, with sufficient particularity, that Defendants intentionally participated in a scheme whereby Defendants used wires—its call center, email, and websites—to sell fraudulent healthcare products to the Consumer Members, knowing that the scheme was fraudulent, *see supra* Discussion Section II.A., so that Defendants, the Aliera

Insiders, and the alleged enterprise more generally, could obtain funds at Sharity's expense.

### 3. Proximate Cause

To survive the motion to dismiss stage for a Georgia RICO claim, the Sharity Trustee "must show that [Sharity's] injury was the direct result of a predicate act targeted toward [Sharity], such that [it] was the intended victim." *Wylie*, 746 S.E.2d at 694; *see also Nicholson v. Windham,* 571 S.E.2d 466, 468 (Ga. Ct. App. 2002) ("As a mandatory condition to asserting [a] RICO claim[ ], [a plaintiff] must show a direct nexus between at least one of the predicate acts [alleged] and the injury she purportedly sustained") (footnote omitted); *Gentry v. Volkswagen of America,* 521 S.E.2d 13, 19 (Ga. Ct. App. 1999) ("[t]he question is whether the injury was directly caused by any RICO violation, not whether the injury was [the] reasonably foreseeable" result of the RICO violation) (citation omitted). The so-called direct nexus needed to establish proximate cause requires the plaintiff to "'show that the injury suffered flowed *directly* from the predicate offense.'" *Nicholson,* 571 S.E.2d at 468 (citing *Gentry,* 521 S.E.2d at 19) (emphasis in original).

In our case, the Sharity Trustee alleges that Defendants' predicate acts did in fact directly harm Sharity. In its Amended Complaint, the Sharity Trustee alleged that Defendants' participation in the predicate acts, while also committed against the Consumer Members, was indeed directly intended to hurt Sharity by intentionally depriving it of funds to pay its debts so Defendants' allegedly exorbitant commissions could be paid.

More specifically, Sharity was responsible for the payment of Consumer Members' medical claims pursuant to its agreement with Aliera. (Am. Compl. ¶¶ 31, 33, 51, 65, 69, ECF No. 7). Aliera's Insiders and Defendants are alleged to have made intentional affirmative misrepresentations to Consumer Members about Sharity's HCSM status and its healthcare plans in order to sell these HCSM plans. Knowing that Sharity was responsible for the payment of medical claims, the Court can plausibly infer that Defendants knowingly and intentionally committed wire fraud in order to receive its exorbitant commissions with the intent of leaving Sharity insolvent and unable to pay its debts.

In other words, the harm to the Consumer Members only came about because of the harm to Sharity. Had Defendants and the Aliera Insiders not left Sharity with inadequate cash on account of the payments they took from the scheme, the Consumer Members would not have been injured. So, while Sharity was not necessarily on the other end of the phone calls, emails or webpage, Sharity was still a target of the harm. Due to the misrepresentations committed by Defendants, Sharity also allegedly became subject to investigations, cease and desist orders, and substantial governmental fines and penalties in addition to legal fees culminating in the inability to pay its increasing liabilities, lawsuits and regulatory actions, lost revenue, and compensatory damages.

Thus, taken in the light most favorable to the Sharity Trustee, Sharity was directly harmed by Defendants' participation in the wire fraud scheme by being deprived of funds to pay its increasing liabilities arising from the scheme. Under the

facts alleged, Sharity was an intended victim of, and directly injured by, Defendants' predicate acts of wire fraud. Therefore, the Court finds the Sharity Trustee sufficiently stated a claim to plausibly find Defendants proximately caused injury to Sharity.

Having found that the Sharity Trustee sufficiently alleged Defendants' participation in an enterprise, which Defendants furthered through the commission of a pattern of wire fraud, and directly injured Sharity through the commission of that pattern of predicate acts, the Court concludes that the Sharity Trustee has stated a claim against Defendants for Georgia RICO.

### D. Defendants' Alternative Request for More Definite Statement

Finally, Defendants argue that, as an alternative to the other relief requested, the Trustees should be ordered to provide a more definite statement of the allegations under Fed. R. Civ. P. 12(e).

Under Fed. R. Civ. P. 12(e), which is made applicable to this adversary proceeding through Fed. R. Bankr. P. 7012(b), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." A Rule 12(e) motion should only be granted if the pleading "fails to specify the allegations in a manner that provides sufficient notice." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). "Other courts within this Circuit have applied a 'high standard' in ruling on 12(e) motions, noting that 12(e) motions are 'not favored in light of the federal system's liberal discovery practice.'" *Julmist v. Owners Ins. Co.*, No. 1:21-cv-01506-

SDG, 2021 WL 3472814, at *2 (N.D. Ga. Aug. 6, 2021) (citing *Smith v. Transcon. Ins.
Co.*, No. 05-CV-22864-KLEIN, 2006 WL 8433250, at *1 (S.D. Fla. Mar. 30, 2006)
(quoting *Beacon College, Inc. v. Phila. Indem. Ins. Co.*, No. 505CV374OC10GRJ, 2006
WL 485101, at *2 (M.D. Fla. Feb. 28, 2006))).

Rule 12(e)'s purpose is to give the defendant enough notice to be able to respond
and defend itself in its Answer, not to confer standing. Where the defendants are
equipped with sufficient notice to be able to raise a 12(b)(6) motion, those defendants
are equipped with sufficient notice to answer. *See Julmist*, 2021 WL 3472814, at *3
(concluding that where "the factual and legal bases for Plaintiffs' allegations are
sufficiently clear for [the defendant] to argue that . . . [the plaintiff] has no
standing[,] . . . [s]uch arguments are inconsistent with [the defendant's] position that
it has insufficient notice to reasonably prepare a defense because they are, in fact,
defenses" that can be raised in an answer).

Therefore, because Defendants here had sufficient notice to raise arguments
about standing, *in pari delicto*, and failure to state a claim in its Motion to Dismiss,
the Court finds that a more definite statement from the Trustees is unnecessary.
Accordingly, Defendants' request for relief under Fed. R. Civ. P. 12(e) is denied.

## CONCLUSION

Based on the allegations in the Amended Complaint, matters of public record
in *Aliera* and *Sharity* that the Court has taken judicial notice of, and the arguments
of the parties in the briefs, the Court finds that the Trustees have met their burden
of establishing standing and stating a claim for all Counts. The Court also finds that

it is premature at this stage of the proceeding for the Court to apply the *in pari delicto* defense to dismiss the Trustees' Georgia law claims. Accordingly, based on the foregoing, it is hereby

**ORDERED** that Defendants' Motion to Dismiss the Amended Complaint for lack of standing is **denied**; and it is

**FURTHER ORDERED** that Defendants' Motion to Dismiss Counts VI, VII, and VIII for the *in pari delicto* defense and failure to state a claim is **denied**; and it is

**FURTHER ORDERED** that Defendants' Motion for More Definite Statement is **denied**.

The Clerk is directed to serve a copy of this Order on on Counsel for the Plaintiffs and the Defendants.

**END OF ORDER**